Reed, Justice (Ret.),
sitting by designation, delivered the opinion of the court:
The plaintiff is seeking compensation for cleaning work which the United States required it to perform as part of a contract between the parties to clear a defense plant and place the equipment for production of 155mm shells in government reserve storage. Plaintiff contends that the contract did not obligate it to do the type of cleaning demanded by the government. The government contends that the contract did necessitate such cleaning without extra pay. We have concluded that the government’s interpretation is correct.
The reserve storage program was developed by Army Ordnance after the Second World War to facilitate any future *874 mobilization by preserving presently unneeded, defense production equipment in usable condition. Army Ordnance has established a number of storage facilities as depositories for such equipment.
This particular reserve storage project resulted from the government’s decision in 1957 to cancel the production of 155mm shells at The Englander Company plant in Birmingham, Alabama. The Army’s Birmingham Ordnance District was instructed to make the necessary arrangements for placing the equipment in reserve storage. Birmingham Ordnance originally decided to accomplish this in two stages. It would first let a contract to Englander to clear the plant and ship the equipment to the Michoud Ordnance Depot in Louisiana, the storage facility for the Birmingham District. Birmingham Ordnance would then let a second contract to rehabilitate the equipment, process it for long-term storage, and place it in final storage at Michoud.[1]
Plaintiff’s officers were first contacted by an officer of the Englander Company who invited them to bid on the plant clearance and shipment subcontract and told them that he understood that Birmingham Ordnance would be letting a second contract for the rehabilitation work at Michoud sometime in the future.[2] Plaintiff is an industrial engineering firm which specializes in plant clearance and preservation work. Plaintiff has operated the Cleveland Ordnance District’s storage facility at Lordstown, Ohio, and has processed substantial quantities of equipment for reserve storage under contracts with Army Ordnance.[3]
Englander furnished plaintiff with a copy of the contract specifications for removal of the machinery from Englander which were drawn by Birmingham Ordnance for plaintiff’s guidance in preparing its bid. Although reserve storage processing work is normally done according to an Ordnance *875 Manual which is entitled “Preparation, Handling, and Maintenance of Production Equipment for Reserve Storage” and which is commonly known as ORDM 4-6, Birmingham Ordnance did not simply instruct the contractor to do the work according to the manual. The contract specifications contained detailed instructions for each phase of the work. Some of these instructions incorporated parts.of ORDM 4r-6 by reference, some repeated instructions in ORDM 4-6, and others varied from ORDM 4-6 procedures.
The instructions for cleaning, preserving, and skidding were contained in Part 4 of the Englander specifications. The Part 4 instructions provided that each type of machinery should be cleaned in accordance with “good commercial shop practice,” coated with a designated preservative, and skidded in accordance with ORDM 4-.6.[4] For example, Paragraph 4.1.1 said:
Metal working machinery will be cleaned of all chips, dirt, grease etc. in accordance with good commercial shop practice. External precision and other bright metal surfaces will be coated with MIL-C-16173, Grade 2, Preservative. Piping to a machine will not be cut but will be disconnected in a workmanlike manner with proper labelling for identification. Electrical supply cables will be handled in accordance with Paragraph 2.6, this Appendix. iSkidding will be accomplished in accordance with ORDM 4-6.
When plaintiff’s officers read the specifications, they concluded that the government did not want an ORDM 4r-6 cleaning job. The instructions in ORDM 4-6 provide for the disassembly of equipment, hand-cleaning of individual parts with solvent, and reassembly of the equipment.[5] Plaintiff’s officers had frequently seen commercial machine shops clean equipment of this type by simply blowing out the chips and wiping the exterior critical surfaces. They assumed that the government had used the term “commercial shop practice” to describe that type of superficial cleaning and computed their bid to Englander on that basis.[6]
*876 T. A. Rivenbark, the industrial engineer at Birmingham Ordnance who drafted the specifications, testified that he was thinking of an altogether different commercial cleaning practice. Rivenbark said that commercial firms sometimes use mechanical techniques such as steam-cleaning and shot-blasting to clean the external and internal parts of this type of machinery and that those techniques are less costly and time-consuming than hand-cleaning with solvent and accomplish much the same result. Therefore, he concluded that it would be advantageous to permit the contractor to use any accepted commercial cleaning method so long as the end result was equivalent to OREM 4-6 cleaning.[7]
The plaintiff’s conception of commercial shop practice cleaning differed radically from the type of cleaning Riven-bark said he had in mind. Plaintiff’s officers assumed that they would not be required to perform any internal cleaning while Rivenbark meant that they could use mechanical techniques to accomplish the internal cleaning.
If the proposed Englander subcontract had been awarded to plaintiff, we would be inclined to uphold the plaintiff’s interpretation. Since the type of cleaning plaintiff planned to do and the type of cleaning Birmingham Ordnance expected plaintiff to do are both commercial cleaning practices, we cannot say that the language of Part 4 necessarily requires one or the other. Under such circumstances this court has usually adopted the contractor’s interpretation of an ambiguous government-drawn contract if the contractor actually and reasonably relied upon that construction at the time of the bidding. See WPC Enterprises, Inc. v. United States, 163 Ct. Cl. 1, 323 F. 2d 874 (1963). Since this equipment was to be cleaned again as part of the rehabilitation contract it would have been reasonable to assume that the superficial cleaning plaintiff expected to perform would be adequate to maintain the equipment until the second cleaning was performed.
However, the proposed subcontract was never let. Eng-lander decided that it did not want to assume responsibility *877 for clearing tlie plant and asked Birmingham Ordnance to arrange plant clearance directly.[8] At about the same time Birmingham Ordnance learned that the Army did not have sufficient funds to rehabilitate the equipment. Therefore, Birmingham Ordnance decided to revise its plans and to let one contract to clear the plant, ship the equipment to Michoud, and place it directly into final storage at Michoud without rehabilitation.[9]
Michael Haworth, the contract specialist at Birmingham Ordnance, called the plaintiff and two other firms which submitted bids to Englander, told them Birmingham Ordnance was letting the contract directly, and arranged appointments to discuss the contract. Meanwhile Rivenbark revised the original specifications to serve as an appendix for the new contract. Since the processing work which he had expected to be done under the originally proposed subcontract would have been adequate for long-term storage, he made very few changes in the specifications. The revisions which Riven-bark made consisted primarily of the deletion of the word “temporary” at various places in the specifications which referred to temporary preservation and temporary storage.[10]
When Haworth met with Robert Shaw, plaintiff’s vice-president, on November 8, 1957, Haworth told Shaw that there had been some changes in the specifications and asked him to note them on Shaw’s copy of the Englander specifications. Haworth then dictated the changes to Shaw.[11]
Haworth also read Shaw a letter which was supposed to describe the purpose of the conference. Haworth’s letter read in part:
You are requested to submit a proposal based on the following information:
1. To accomplish preservation for long term storage and skidding of equipment items in strict accordance with ORDM 4-6.
*878 2. To load all items aboard common carrier at Birmingham, Alabama, to unload and place in storage at Michoud Ordnance Plant, Louisiana.
3. To include no amount for performing rehabilitation.
4. To include no amount for plant restoration.
You are advised that the Government would contemplate preservation for long term storage being performed at Michoud Ordnance Plant; however, you have the option to negotiate with The Englander Company for the use of their facilities in the event Plant Clearance and preservation could not be accomplished prior to the Close of Business, 16 December 1957. The Government desires that Plant Clearance be accomplished with the utmost speed, but in no event later than the Close of Business, 16 December 1957.[12]
Haworth did not explicitly tell Shaw that the two contracts plan had been abandoned. Since Birmingham Ordnance had never told plaintiff about the two contracts plan in the first place, there was no occasion to tell the contractor that there would never be a separate rehabilitation and long-term storage processing contract. Haworth’s instructions to delete references to temporary storage and his letter stating that one purpose of the contract was to accomplish preservation for long-term storage were adequate to inform Shaw that the government now planned to put the equipment directly into final storage at Michoud.
Nevertheless, Shaw failed to grasp the significance of the letter and the terms of the proposed contract. He still thought the government wanted plaintiff to clear the plant, perform superficial cleaning, and deposit the equipment at Michoud to await final processing, including another more thorough cleaning, under a “second” contract.[13]
Plaintiff submitted a bid comparable to its original bid to Englander, Haworth objected that the transportation estimate was excessive, plaintiff reduced the bid, and Birming *879 ham Ordnance decided to award the contract to plaintiff. Birmingham Ordnance then prepared a formal contract which incorporated the revised specifications as Appendix 1 and sent it to plaintiff for signature.[14] This contract was signed on November 26, 1957. Although the cover page designated it as “Contract for -Removal, Transportation and Preparation for Long Term Storage of Government Facilities ; Preparation of Shipment to Government Installation,” plaintiff’s officers still assumed that they were entering into a contract to prepare the equipment for temporary storage.[15]
Plaintiff then proceeded to clear the plant, ship the equipment to Michoud, and to clean the equipment according to its conception of commercial shop practice. The inspector refused to accept the equipment because plaintiff had not performed ORDM 4r-6 cleaning. Plaintiff insisted that its contract did not require ORDM 4 — 6 cleaning.[16] The dispute was referred to a contracting officer who ruled that plaintiff must perform a cleaning job of ORDM 4-6 quality, but could use mechanical techniques to accomplish the cleaning.[17] The Armed Services Board of Contract Appeals affirmed the contracting officer. Randolph Engineering Co., 58-2 BCA 8651 (ASBCA 1958). Meanwhile plaintiff performed internal cleaning to the satisfaction of the inspectors. Plaintiff used the mechanical techniques authorized by the contracting officer in accomplishing that cleaning.[18]
*880 Plaintiff contends that the Board’s decision is inconsistent with this court’s decision in WPC Enterprises, supra.[19] According to the plaintiff’s interpretation of WPC Enterprises the contractor’s interpretation of an ambiguous term must be adopted if the government drafted the contract. However, the plaintiff’s interpretation is not an accurate statement of the WPC Enterprises rule. WPC Enterprises says that the contractor’s interpretation of a government-drawn agreement will be adopted if Hie contractor actually and reasonably relied upon that interpretation when it entered into the contract, 163 Ct. Cl. at 6, 323 F. 2d at 876. Although the evidence in this record indicates that this contractor actually relied upon its present interpretation of commercial shop practice cleaning at the time it entered into the contract, the evidence also indicates that the contractor’s interpretation was not a reasonable interpretation.
Since Haworth’s letter, Haworth’s instructions to delete references to temporary storage, and the title of the contract were adequate to inform plaintiff’s officers that Birmingham Ordnance planned to put this equipment directly into long-term storage, plaintiff must be held accountable for everything its officers would have known if they had understood that this was Birmingham Ordnance’s plan. We do not believe that plaintiff’s officers could have reasonably concluded, given their knowledge of the reserve storage program *881 and tbe techniques of preservation, that the government was contracting to put this equipment into final storage at Michoud without internal cleaning. Government experts testified that this type of machinery is likely to rust if it is placed in storage for a long period of time without internal cleaning.[20] The plaintiff’s president, who was himself one of the pioneers in the development of the art of preservation, agreed generally with the conclusions of the government witnesses. He said in his testimony before the Board that it would be poor policy to put such equipment into long-term storage without internal cleaning.[21]
Plaintiff’s officers did testify that the danger of rust is greatly diminished if the humidity is properly controlled and that it would be possible to preserve such equipment in usable condition by placing it in humidity-controlled storage without cleaning. They testified that the Army has sent a substantial amount of equipment which had not been cleaned at all to the humidity-controlled storage facility at Lordstown. Plaintiff would apparently have us infer from this that it would not be unreasonable to place dirty equipment into long-term storage at Michoud. We do not believe that such an inference is possible. The evidence indicates that the atmospheric conditions at Michoud are not controlled to the same extent as those at Lordstown and that the danger of rust is substantially greater.’[22] Since Shaw visited Michoud on the day before he talked with Haworth, he undoubtedly observed that the storage facilities at Michoud are not equivalent to those at Lordstown. Therefore, he could not have expected the Army to put this equipment into final storage at Michoud without internal cleaning.
Shaw’s own statements confirm that he would never have expected the Army to do this. Shaw’s memorandum of De *882 cember 19, 1957, advising bis colleagues that the ordnance inspectors had refused to accept the equipment states: “This information was more in keeping with my thoughts on the matter, since I felt certain they would not permit equipment of this nature to only be commercially processed [sic] and then placed in final storage.” [23]
If plaintiff’s officers had understood, as they should have understood, that Birmingham Ordnance planned to put this equipment into long-term storage at Michoud, they undoubtedly would have realized that Birmingham Ordnance must have meant something other than external cleaning when Birmingham Ordnance instructed them to perform “commercial shop practice” cleaning. Therefore, the contractor’s interpretation was not reasonable and the WPC Enterprises rule is not applicable to this case.
Under these circumstances we think the Board properly concluded that the term “commercial shop practice cleaning” must be interpreted in the light of the purpose of the contract to mean commercial practices for accomplishing internal cleaning. Randolph Engineering Co., 58-2 BCA 8651, (ASBCA 1958). Therefore, plaintiff is not entitled to additional compensation for performing such cleaning.
Judgment is entered for defendant and plaintiff’s petition is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:[24]
1. Plaintiff is a corporation organized and existing under and by virtue of the laws of the Commonwealth of Pennsylvania, and having its principal office on U.S. Boute 19, Pittsburgh, Pennsylvania.
2. On August 21, 1957, the Birmingham Ordnance District of the Department of the Army (hereinafter referred to as bhod) terminated for the convenience of the Government a production contract whereunder The Englander Com *883 pany of Birmingham, Alabama (hereinafter referred to as Englander) had been producing 155mm shells. The effective date of the termination was September 16, 1957. Pursuant to the terms of a companion facilities contract, Englander was obligated to store the Government-owned facilities free of charge for 90 days after the effective date of the termination, i.e., to December 16, 1957. The charge after this date was $6,000 per month or any part thereof. Said contract further provided that the parties could negotiate a supplemental agreement for the costs of dismantling, the prepara-ion for shipment, and loading and shipping of the facilities.
3. The original plan of bhod was to have Englander clear the Englander plant of the facilities which had been used in producing shells and unload such facilities and place in storage at Michoud Ordnance Plant near New Orleans, Louisiana, and that thereafter a second contract would be let to perform “processing” and the placing in long-term storage. Toward this end, the defendant had prepared and sent to Englander a detailed description of the work it wanted done under the first contract. On September 30, 1957, upon receipt of such detailed description, Englander solicited bids from various machinery moving firms, including the plaintiff, and requested potential bidders to submit their bids by October 10,1957.
The plaintiff and two other firms submitted bids to Eng-lander. The plaintiff’s bid to Englander for the performance of the work involved under the original plan of clearing its plant, unloading and placing the facilities in a designated building at Michoud, was $186,300. On November 4, 1957, Englander decided that it would prefer to have the Government assume the responsibility for the clearance of its plant. It later confirmed its position in a letter of November 8. On November 4, however, it communicated to the office of the contracting officer the names of those firms which had bid on doing the plant clearance.
4. On November 4, 1957, Mr. Michael E. Haworth, Jr., contract specialist at bhod, telephoned the plaintiff company and spoke to Mr. Robert L. Shaw, plaintiff’s vice-president. Haworth requested the plaintiff to submit a bid by telephone on the basis of the scope of the work (this term *884 was used throughout the trial, referring to the specifications) which it had received from Englander and which had been the basis of the plaintiff’s bid to Englander. Shaw told Haworth that it was contrary to the plaintiff’s policy to submit a telephone bid, but that he would come to Birmingham to discuss the matter in detail there. A conference was apparently arranged for November 8, 1957. In preparation for this conference, Shaw, who had already visited the Eng-lander plant, went to New Orleans to see the Michoud Ordnance Plant. He there talked with Mr. S. L. Moyers, the officer in charge.
5. The conference was held on November 8, 1957 at bhod. Shaw asked for the scope of the work on which a bid was requested of plaintiff. Haworth asked if Shaw had a copy of the scope of the work which had been furnished to the plaintiff by Englander. Shaw said that he did have such a copy. He was told to get it out and Haworth said there were certain changes to be made in the scope of the work and that he would tell Shaw what those changes were. He did so and as he did so, Shaw made handwritten changes and additions to the copy he had as they were discussed. The changes basically related to the elimination of the word “temporary” in relation to the preservation and also storage. As the conference closed, Shaw was handed a letter signed by M. E. Haworth, Jr., dated November 8, 1957, which reads as follows :
This letter will serve to confirm information furnished by Mr. M. E. Haworth, Jr., of this office during telephone conversation on 4 November 1957.
You are advised that the Government has assumed the responsibility of negotiating for Plant Clearance and Layaway of facilities currently located at The Eng-lander Company, Incorporated, 521 North 31st Street, Birmingham 4, Alabama. Your proposal has previously been submitted to' The Englander Company, Incorporated, in accordance with the Scope of Work as outlined in Appendix I, Exhibit “A” and Exhibit “B”, previously furnished. In view of the fact that the Government has elected to contract separately for effecting Plant Clearance of the facilities, the Scope of Work as previously anticipated has been changed.
*885 You are requested to submit a proposal based on the following information:
1. To accomplish preservation for long term storage and skidding of equipment items in strict accordance with ordm 4-6.
2. To load all items aboard common carrier at Birmingham, Alabama, to unload and place in storage at Michoud Ordnance Plant, Louisiana.
3. To include no amount for performing rehabilitation.
4. To include no amount for plant restoration.
You are advised that the Government would contemplate preservation for long term storage being performed at Michoud Ordnance Plant; however, you have the option to negotiate with The Englander Company for the use of their facilities in the event Plant Clearance and preservation could not be accomplished prior to the Close of Business, 16 December 1957. The Government desires that Plant Clearance be accomplished with the utmost speed, but in no event later than the Close of Business, 16 December 1957.
You are requested to submit by telephone a lump-sum quotation and price breakdown information to accomplish Plant Clearance and Layaway as outlined above. Your quotation should include a separate figure for cost of photography and should indicate whether freight from Birmingham to Michoud Ordnance Plant is included or excluded.
Information is furnished that the Government is interested in negotiating with your firm for accomplishment of the Scope of Work indicated. It is anticipated that the various proposals that this District expects to receive will be evaluated, and a contract finalized with the successful bidder on or about 18 November 1957.
6. The scope of the work which Shaw had before him at the conference described in the preceding finding, as changed by Shaw pursuant to the discussion with Haworth, is quoted in full below,[1] with the additions in italics and the deletions in brackets.
*886 APPENDIX I
PREPARATION 0E 155MM, Mil 01 SHELL LINE FOR SHIPMENT PROM THE ENGLANDER COMPANY, INC., BIRMINGHAM, ALABAMA, TO MICHOUD ORDNANCE PLANT, NEW ORLEANS, LOUISIANA
THE ENGLANDER CO., INC.
Birmingham, Alabama

Nov. 8,1957

PACKAGE LINE FOR ITEM — SHELL HE, M101, CAPACITY 45,000 PER MONTH ON 2-8-5 BASIS
The attached Exhibit “A” list of machinery and equipment with accessories, dies and tools, special tooling, all in accordance with Government Historical records for each property (Govemment Tag) number listed, except as herein noted, shall be cleaned, photographed as required, [temporarily] preserved, skidded, boxed and/or packaged in accordance with instructions contained herein at The Englander Company, Inc., Birmingham, Alabama, loaded aboard carrier, blocked and protected as required herein, shipped by carrier to Michoud Ordnance Plant, New Orleans, Louisiana, unloaded and placed in a [temporary] storage location in Michoud Ordnance Plant. rH
The attached Exhibit “B” list of machinery and equipment shall not require photographing or processing for shipment to Michoud Ordnance Plant but shall require removal from The Eng-lander Co, Inc.’s plant and loading as required and which will be disposed of by the Government on plant site. rH
GENERAL REQUIREMENTS CÍ
Each item of production equipment designated to be shipped shall be cleaned in accordance with good commercial practice [and receive temporary preservative treatment as soon as possible following awarding of contract.] tH oí
Wherever possible, cleaning of metal working machinery in accordance with good commercial practice shall be accomplished while they are still connected to power and in original operating position. to to
All material used in connection with the work performed hereunder shall be of a grade and quality conforming with applicable Government CO ci *887 specifications where specified and with good commercial standards in the absence of Government specifications.
2.4 The workmanship, in connection with the work performed hereunder, shall be good and all disassembling and reassembling, where necessary to clean, temporarily preserve and skid in accordance with provisions of this Appendix, shall be performed only by experienced machine tool millwrights and maintenance men; operations shall be under the continuous supervision of a master mechanic.
2.5 Precision instruments under service contracts or guarantee with the manufacturer shall be processed under specific instructions of subject manufacturer.
2.6 Electrical supply cables are not to be cut, but will be disconnected from machines in a workmanlike manner and terminals on machines and equipment will be properly identified. A check will be made to insure the presence of a schematic wiring diagram inside each terminal box.
2.7 All machines and equipment shall be skidded in accordance with the specifications outlined in okdm A-6.
2.8 Bright metal or other precision surfaces will be spray coated with Corrosion Preventive, Solvent Cutback, cold application Soft Film mil-o-16173, Grade 2 prior to shipment.
2.9 Adequate protection from the elements shall be provided at all times during the shipment.
2.10 Wherein partial dismantling is necessary to remove any item of equipment such as rotary furnaces, coolout conveyors, etc., disassembling will be accomplished in such a manner as to best facilitate reassembly. Paint marking or numbering of component parts or sections will be incorporated and instruction for reassembly will be included with the Historical Record.
2.11 Prior to dismantling, all machines will be exercised for a period of not less than ten (10) minutes and those machines requiring draining of oil or hydraulic systems will be immediately drained and disconnected from the power source. A notation will be placed on the machine indicating that oil and hydraulic systems have been drained.
2.12 In the disassembly or dismantling of items not included in this Appendix for shipment to Michoud *888 Ordnance Plant, the contractor will exercise good judgment in the salvaging of serviceable parts or components and will segregate such, salvageable items from residual scrap. The Government will effect disposition at the Englander Company, Inc., B’ham, Alabama.
2.13 Contractor may use crane, Property #221-54, Acetelyne Burning equipment, Property _ 224-65 and lift truck, Property #224-43 to assist in moving machinery. Air Compressor
3. Records and photography
3.1 Historical Records will be examined for accuracy and completeness in accordance with ordm 4-6, and brought up to date as required.
3.2 All items of equipment shall be examined for completeness and cleanliness in accordance with good commercial shop practice, assuring that all surfaces are free of dirt, grease, sludge, chips and other contaminating agents prior to photographing. Equipment already coated with preservative will not be degreased for purposes of photography.
3.3 Photographs of all special purpose machines processed will be made. General purpose machines will not be photographed except in those instances where they are substantially altered by the addition of special tooling. In general, photographs should be limited to two (2) views of each production unit, although there may be expections [sic] requiring additional views. Wherever practicable, photographs will be made with machines in operating position. All jigs, fixtures and special tooling constituting part of the item of production equipment will be left in place during the photographing. Particular emphasis will be placed on photographing the fixturing with work piece in place, if practicable, and in photographing the overall machine to show location of heads, turrets, wheels, etc. Photographs of fixtures will be equally acceptable in instances where retention of fixture sketches is specified.
3.3.1 When photographing a basic unit of production — a blackboard, magnetic board or a similar device showing the manufacturer of the machine, the motor number, the serial and Government Tag Number, the end item which the machine is manufacturing, the component and operation on which the machine is being used as well as the *889 Standard Commodity Classification Code (SCC) and the Rock Island Arsenal Log Number will be used. See ORDM 4-6, Page 38, for illustration.
3.3.2 When photographing machines which have been removed from operating position, the above procedure will apply, except of course the photograph of work piece in place.
3.3.3 Finished photographs will be glossy prints suitable for microfilming and will be 8" x 10" in size. One print of each negative will be inclosed in a transparent oil and moisture proof covering, which shall be large enough to hold the photograph without folding and shall be securely attached to the exterior of the equipment in a prominent, yet will [sic] protected position. One (1) print of each negative shall become a part of the property records. When accountability of equipment is transferred, one (1) print of each negative shall be sent to the consignee. One (1) print of each negative, together with the negatives, shall shall be forwarded to the Contracting Officer.
3.4 The following engineering data will be assembled and shipped to Michoud Ordance Plant for storage with the packaged line: All machine and machine part drawings, a plant layout drawing, tool and gage drawings, descriptions of manufacture, operation and parts manual or lists. One (1) copy of plant layout drawings, tool and gage drawings and description of manufacture will be submitted for review and be retained by the District.
4. DETAIL REQUIREMENTS-CLEANING, TEMPORARY PRESERVING AND SKIDDING
4.1 Metal W orking Machinery
4.1.1 Metal working machinery will be cleaned of all chips, dirt, grease, etc. in accordance with good commercial shop practice. External precision and other bright metal surfaces will be coated with mil-c-16173, Grade 2, Preservative. Piping to a machine will not be cut but will be disconnected in a workman-like manner with proper labeling for identification. Electrical supply cables will be handled in accordance with Paragraph 2.6, this Appendix. Skidding will be accomplished in accordance with ordm 4-6.
4.2 Furnaces, Ovens and Coolout Conveyors
4.2.1 Fire brick shall be removed from all furnaces, ovens and coolout conveyors. The cleaning of *890 all furnaces, ovens and coolout conveyors shall be in accordance with good commercial shop practice. Disconnection of electrical power will be in accordance with Paragraph 2.6, this Appendix. Disconnection of piping will be in a workman-like manner with proper labeling for identification. Dismantling shall be in accordance with Paragraph 2.10. Skidding will be accomplished in accordance with ordm A-6. Bare metal surfaces such as drive shafts, sprockets, conveyor chains and gears shall be coated with mil-c-16173, Grade 2, Preservative.
4.3 Piping, Spray Booths, Shot Blast Equipment, Conveyors, Etc. _
4.3.1 _ Equipment of this type shall be cleaned in accordance with good commercial shop practice and handled as units or dismantled where necessary to skid properly. Disconnection from electrical power will be in accordance with Paragraph 2.6, this Appendix. Piping will be disconnected in a workman-like manner and connections at machines or equipment properly identified. Skidding will be in accordance with ordm: 4-6. External bright metal surfaces such as motor and drive shafts, drive chains, etc. will be coated with mil-c-16173, Grade 2.
Air Compressors & Pumps
All supply to equipment will be disconnected in a workman-like manner and connections at machines or equipment will be properly tagged for identification. Compressors wifi be cleaned in accordance with good commercial shop practice. External bright metal surfaces will be coated with mil-o-16173, Grade 2, Preservative. Electrical power will be disconnected in accordance with Paragraph 2.6, this Appendix. Skidding will be done in accordance with oedm 4-6. t
Cranes, Hoists and Lift Trucks w
Items of this type shall be cleaned in accordance with good commercial shop practice, bright metal surfaces will be coated with mil-c-16173, Grade 2 and the items skidded in accordance with oedm 4^6. Dismantling where necessary will be in accordance with Paragraph 2.10 of this Appendix. w i —
Electrical ój
Disconnection of electrical equipment from power sources shall be performed under the supervision of competent electricians. If bus bars are to be os í *891 removed, they will be disassembled, not cut. Disconnected control wire shall have all ends plainly tagged or otherwise identified to show terminal block or junction box number. Dry cell batteries in recording systems on electrical panels shall 'be removed. Make certain that a wiring diagram is secured to the inside of the control panel door.
4.7 Other Equipment
4.7.1 All other equipment not covered individually herein shall be cleaned in accordance with good commercial practice, external bright metal surfaces will be coated with Preservative mil-c-16173, Grade 2 and skidded in accordance with ORDM 4-6.
CONTRACT COMPLETION DATE ó
The contractor shall perform the work beginning promptly after an award of contract and must complete the work not later than 13 December, 57. The contractor is encouraged to accomplish the work within approximately 30 days after date of award of contract. »
APPLICABLE SPECLETCATIONS • CO
Specifications listed in Appendix 1 of ordm 4-6 dated August 1954 shall apply. CO
Specification mil-c-14201-a Grade 1, Corrosion Preventing Solvent cutback, Cold application may be substituted for mtl-c-16178, Grade 2 Corrosion Preventive, Solvent Cutback, cold application in each instance specified herein. OS to
EIRE BRICK DISPOSAL •
The Firebrick removed from all furnaces and coolout conveyors shall be disposed of by the contractor at the time of removal. J-t
residual scrap CO
Items not specified for shipment under the Government’s historical records for each item to be shipped, such as electrical conduit and wire, installation piping, sheet metal vent hoods, Exhaust Ducts, and other similar items shall be considered residual scrap and be collected into like piles of similar items to facilitate disposal which will be made by the Government. iH CO
Valves that are a part of an installation piping system of which the piping will become residual scrap shall remain with the piping if of 3" size or smaller or if of any size and not in codes 0-2 used, good, or better condition. CO to
*892 Valves of over 3" size and in Code 0-2, used, good, or better shall be processed and shipped where practicable with the item it is closest associated with or otherwise be separately skidded or boxed and marked or tagged indicating item used with. When valves are to be salvaged as such, connecting flanges will be salvaged by either unscrewing from pipe and be reassembled to value or by cutting or burning pipe approximately 6" to 12" from Flange on each side.
BLOCKING
Blocking of machinery and equipment on skids shall be in accordance with okdm 4-6. ’“í
Blocking of skidded machinery and equipment aboard carrier shall be in accordance with commercial practice. bo
BOXING MP ‘
Boxing of machinery and equipment accessories shall be in accordance with Par. 13b (4) oedm 4-6 in boxes in accordance with jan-p-106. Tops of boxes shall be attached with screws instead of nails. Boxes may contain up to 500 pounds net. Special Tooling Added, M P Í-L
WEATHER BROTE CTION IN TRANSIT T — I y — i
Machinery and equipment being transported aboard open type carrier shall be protected from the weather by covering with a tarpaulin. For shipments being transported by railroad, heavy commercial water-proof paper may be substituted in leiu [sic] of a tarpaulin provided suitable metal overall strapping is used to insure the paper remaining in place during transit. T — { rH
7. The plaintiff prepared its written bid dated November 12, 1957 which was apparently handed to Mr. Haworth at bhod on November 13, since further negotiation took place on that day. That letter reads as follows:
In accordance with your request dated 8 November, 1957 we would like to submit our proposal for the Plant Clearance of the Government Owned Facilities located at the Englander Company, Inc. plant, Birmingham, Alabama.
Our proposal is based on preparing this equipment in strict accordance with “The Scope of Work” dated 8 November, 1957 and the applicable sections of Ordnance Corps Manual 4-6 dated August 1954.
Since we are desirous of clearing the Englander Company plant is [sic] a most expeditious manner, the ex *893 tent of work to be accomplished at the Englander plant will be determined by the Randolph Engineering Company.
Onr proposal including transportation is in the amount of $188,219.00.
Our proposal excluding transportation is in the amount of $157,617.00.
We trust this proposal is satisfactory for we are most anxious to be of service to the Birmingham Ordnance District.
8. On November 13, 1957, Shaw again met with Haworth and others at bhod, the purpose of the meeting being further negotiation of the plaintiff’s bid price. The discussion centered upon the matter of the cost of transportation of the facilities from Birmingham to New Orleans, progress payments to the plaintiffs instead of one lump sum at the conclusion of the work, with little discussion as to the scope of the work. One matter that was discussed in some detail dealt with the proposition that the plaintiff would be required to indemnify the Government from the payment of storage charges of $6,000 per month or any portion of a month from December 15,1957 to February 15,1958.
9. The defendant’s engineers, meanwhile, had redrafted the scope of the work for inclusion into the proposed contract, omitting the words “temporary” and “temporarily” wherever they appeared in the scope of the work quoted in finding 6, and also omitting the bracketed words of paragraph 2.1 relating to the application of temporary preservative treatment. Paragraph 1.1, however, was also changed to include an important reference to ordm 4r-6. As changed, that paragraph reads as follows:
1.1 The attached Exhibit “A” list of machinery and equipment with accessories, special tooling, dies and tools, all in accordance with Government Historical records for each property (Government Tag) number listed, where applicable, except as herein noted, shall be cleaned, photographed as required, preserved, skidded, boxed and/or packaged in accordance with ordm 4-6 and instructions contained herein, loaded aboard carrier, blocked and protected as required herein, shipped by carrier to Michoud Ordnance Plant, New Orleans, Louisiana, unloaded and placed in *894 designated storage location in Michoud Ordnance Plant.
10. On November 15,1957, Mr. Haworth prepared a memorandum of the negotiation conference of November 13, between the plaintiff and bhod. That memorandum is in evidence as plaintiff’s exhibit 2 and reads as follows:
1. On 13 Nov 57 a negotiation conference was held in the offices of this District with Randolph Engineering Company of Pittsburgh, Pa., relative to plant clearance and layaway of facilities currently located at The Eng-lander Co., Inc. The following individuals attended:
For the Contractor: Mr. Robert L. Shaw
Mr. J. C. Hawthorne
For the Government:
Mr. Burch H. Aldridge, Part-time
Mr. Nolan Shory, Part-time
Mr. T. E. Powell, Part-time
Mr. M. E. Haworth, J r.
2. All elements of the proposed Scope of Work were thoroughly discussed with the proposed contractor, including disposition of item as reflected on Exhibit B, disposal of four (4) equipment items reflected on Exhibit A which are currently being advertised for sale, skidding and preservation in accordance with ordm 4-6, loading aboard carrier, shipment, unloading and placing in controlled storage at Michoud Ordnance Plant, and various elements of the proposed appendix supplementing ordm 4-6. In response to the request of this office, Mr. Shaw submitted a proposal in the amount of $188,219.00 (freight included). A proposal excluding transportation was submitted in the amount of $167,-617.00, thereby reflecting freight charges in the amount of $30,602.00. Mr. Shaw was advised that although his proposal was competitive in nature, the Government would not be receptive to accept transportation charges in the amount of $30,602.00. He was therefore requested to re-evaluate his proposal. After due consideration, Mr. Shaw stated that his firm would be willing to reduce transportation charges to $17,500.00, thereby revising the proposal to $175,117.00 (all items considered, including photography).
3. Mr. Shaw stated that it was the desire of his firm to receive partial payments as each equipment item is completely processed and placed in storage. Legal *895 counsel advised the conference members that payment on such a basis could be considered as partial payments rather than progress payments. Subsequently, on 14 Nov 57, Mr. Shaw submitted to this office complete price breakdown for each item reflected on Exhibits a and b indicating the total amount which would be paid for complete processing and placing in storage of each item. At the time this information was submitted, Mr. Shaw stated that his cost computations reveal the presence of excess amounts in the area of transportation charges, and that he would therefore like to revise his proposal to a total amount of $171,617.00 (freight included at $14,000). The firm’s proposal is conditioned upon, (a) Receipt of partial payments as described above, (b) That Randolph Engr. Co. will not become liable for interim storage charges in the event such charges could not be avoided as a direct result of a general strike.
4. In view of the fact that this office accepted Randolph’s revised proposal which reflected a downward revision in the area of proposed transportation charges, Mr. Jesse W. Green of the Tumpane Company of Macon, Georgia, and Mr. C. F. Gottschalk of Dearborns Machinery Movers Co., Inc., New Orleans, La., were contacted by telephone and advised that this office would accept their revised proposal until such time as the contract for the plant clearance and layaway has been executed. The parties were further advised that contemplated date of contract execution would be 18 or 19 November 1957.
11. The contract was prepared by bhod and sent to the plaintiff for execution. It was dated November 26,1957, and was executed on behalf of the parties as of that date. It is noteworthy that prior to being presented the contract for signature, the plaintiff had never actually seen the Scope of the Work which was actually included in the terms of the contract.
12. The contract contained the usual Standard Form 32 General Provisions (supply contract) disputes clause.
13. The face sheet of the contract (No. DA-01-009-ORD-592) provided in pertinent part as follows:
* * * * *
contract for Removal, Transportation and Preparation for Long Term Storage of Government Facilities; Preparation for Shipment to Government Installation.
*896 This contract consists of dd Form 351, Scope of Work consisting of 7 pages, Standard Form 32,. Articles. 21 through. 38 * * * dd Form 351-2, Appendix I consisting of 6 pages and Exhibits “A”, consisting of 5 pages, and “B” consisting of 1 page to Appendix I.[2]
14. The introductory clauses to the contract agreement provided in part as follows:
* * * * *
whereas, It is desired that the Contractor perform all necessary services of maintenance, protection and preservation, pursuant to specifications hereinafter set forth to the end that production with such facilities may be resumed as quickly as possible in the event of a National emergency; and
whereas, It is in the interests of the National defense to maintain, protect and preserve such facilities in standby;
15. The reference to Scope of Work of 7 pages referred to in finding 13, is for the most part a misnomer, since it consisted of 8 Articles, only one of which dealt with work to be done and that one was in addition to the specifications entitled Appendix I which both parties at the trial called the scope of the work.
Paragraph A, of Article I scope of the work, which is pertinent to the case at hand provides as follows:
* * * * *
ARTICLE I. Scope of Work
A. The Contractor, as an independent contractor and not as an agent of the Government, shall, on or before 15 February 1958, perform all of the work and services of plant clearance from the plant of The Englander Company, Incorporated, Birmingham, Alabama, as prescribed in Appendix I attached hereto and made a part hereof; except, however, that the work and services of plant clearance from the plant of The Englander Company, Incorporated to be performed on the facilities as set forth in Exhibit “B” to Appendix I shall be held in abeyance and not commenced until 1 January 1958 unless notification to commence work on said Exhibit “B” facilities is sooner given to the Contractor in writing by the Contracting Officer. Said work and services of plant clearance from The Englander Company, In *897 corporated in accordance with Appendix I shall, in any event, be completed on or before 15 February 1958. The total scope of work, including clearing and preserving and layaway in U.S. Army Ordnance Plant, Michoud, New Orleans, Louisiana, and in full accordance with Appendix I attached hereto, shall be completed no later than six (6) months from the date of execution of this contract. Appendix I may be modified at any time in accordance with the article hereof, entitled “Changes." All work and services hereunder are to be performed in accordance with ORDM 4-6, as implemented by Appendix I attached hereto.
$ ‡ ‡ #
16. Pertinent portions of Appendix I to the contract, are shown below:
APPENDIX I
* * * * *
1.1 The attached Exhibit “A” list of machinery and equipment with accessories, special tooling, dies and tools, all in accordance with Government Historical records for each property (Government Tag) number listed, where applicable, except as herein noted, shall be cleaned, photographed as required, preserved, skidded, boxed and/or packaged in accordance with ordm 4-6 and instructions contained herein, loaded aboard carrier, blocked and protected as required herein, shipped by carrier to Michoud Ordnance Plant, New Orleans, Louisiana, unloaded and placed in designated storage location in Michoud Ordnance Plant.
* * * * *
GENERAL REQUIREMENTS
Each item of production equipment designated in Exhibit “A” shall be skidded, cleaned and preserved at the contractor’s option prior to shipment. T-i
* * * * *
2.3 All material used in connection with the work performed hereunder, shall be of a grade and quality conforming with applicable Government specifications where specified and with good commercial standards in the absence of Government specifications.
2.4 The workmanship, in connection with the work performed hereunder, shall be good and all dis *898 assembling and reassembling, where necessary to clean, preserve and skid in accordance with provisions of ordm 4-6 and of this Appendix, shall be performed only by experienced machine tool millwrights and maintenance men; operations shall be under the continuous supervision of a master mechanic.
* * * * *
2.7 All machines and equipment shall be skidded in accordance with the specifications outlined in ordm 4 — 6.
* * * * *
2.10 Wherein partial dismantling is necessary to remove any item of equipment such as rotary furnaces, coolout conveyors, etc., disassembling will be accomplished in such a manner as to best facilitate reassembly. Paint marking or numbering of component parts or sections will be incorporated and instruction for reassembly will be included with the Historical Becord.
* * * * *
DETAIL REQUIREMENTS-CLEANING, PRESERVING AND SKIDDING
Metal Working Machinery
Metal working machinery will be cleaned of all chips, dirt, grease, etc. in accordance with good commercial shop practice. External precision and other bright metal surfaces will be coated with mil-c-16173, Grade 2, Preservative. Piping to a machine will not be cut but will be disconnected in a workman-like manner with proper labeling for identification. Electrical supply cables will be handled in accordance with Paragraph 2.6, this Appendix. Skidding and preservation will be accomplished in accordance with ordm 4—6.
Furnaces, Ovens and Coolout Conveyors
Fire brick shall be removed from all furnaces, ovens and coolout conveyors. The cleaning of all furnaces, ovens and coolout conveyors shall be in accordance with good commercial shop practice. Disconnection of electrical power will be in accordance with Paragraph 2.6, this Appendix. Disconnection of piping will be in a workmanlike manner with proper labeling for identification. Dismantling shall be in accordance with Paragraph 2.10. Skidding will be accomplished in accordance with ordm 4 — 6. Bare metal sur *899 faces such as drive shafts, sprockets, conveyor chains and gears shall be coated with mil-c-16173, Grade 2, Preservative.
Piping, Spray Booths, Shot Blast Equipment, Conveyors, Etc. CO
Equipment of this type shall be cleaned in accordance with good commercial shop practice and handled as units or dismantled where necessary to skid properly. Disconnection from electrical power will ¡be in accordance with Paragraph 2.6, this Appendix. Piping will be disconnected in a workman-like manner and connections at machines or equipment properly identified. Skidding will be in accordance with oedm 4-6. External bright metal surfaces such as motor and drive shafts, drive chains, etc. will be coated with mil-c-16173, Grade 2.
Air Compressors da Pumps it*
All supply piping to equipment will be disconnected in a workman-like manner and connections if* i-i at machines or equipment will be properly tagged for identification. Compressors will be cleaned in accordance with good commercial shop practice. External bright metal surfaces will be coated with mil-c-16173, Grade 2, Preservative. Electrical power will be disconnected in accordance with Paragraph 2.6, this Appendix. Skidding will be done m accordance with oedm 4-6.
Cranes, Hoists and Lift Trucks lO
Items of this type shall be cleaned in accordance with good commercial shop practice, bright metal surfaces will be coated with mel-o-16173, Grade 2 and the items skidded in accordance with oedm tH lO 4^6 and or as indicated on Exhibit “A”. Dismantling where necessary will be in accordance with Paragraph 2.10 of this Appendix.
* * * * *

Other Equipment

All other equipment not covered individually herein shall be cleaned in accordance with good commercial practice, external bright metal surfaces will be coated with Preservative MHrC-16173, Grade 2 and skidded in accordance with oedm 4-6.
APPLICABLE SPECIEIOATIONS
Specifications listed in Appendix 1 of oedm 4-6 dated August 1954 shall apply. lO
*900 BLOCKING OO
Blocking of machinery and equipment on skids shall be in accordance with ORDM 4-6. tH CO
Blocking of skidded machinery and equipment aboard carrier shall be in accordance with commercial practice. Cn CO
BOXING * Ci
Boxing of machinery, special tooling, and equipment accessories shall be in accordance with Par. 13b (4) ORdm 4-6 in boxes in accordance with ppp-b-621. Tops of boxes shall be attached with screws instead of nails. Boxes may contain up to 500 pounds net. T — I Ci
* * * * *
11. Dust Shields of 6 mil minimum thickness, clear polyethylene type, will be provided as required by ordm 4-6 when equipment is placed in permanent storage.
* * * * *
17. The reference in the contract of ordm 4-6 is to an Ordnance Corps Manual bearing that number which contains instructions to the Ordnance Corps concerning preparation, handling, and maintenance of production equipment for reserve storage. A copy is in evidence as plaintiff’s exhibit 7 and is incorporated herein, by reference. The manual calls upon commanding officers of Ordnance Districts to prepare implementing instructions to carry out the procedures of the manual with implementations to be held to a quality and performance level equal to standards and practices therein set forth. Paragraph 7 of ordm 4-6 provides:
* * * * *
7. CONTRACTUAL REQUIREMENTS
Contracts will normally include the requirements set forth in paragraphs 10-13, together with applicable specifications. These are the requirements that cover the basic operations of preparing inventories and records, inspection, disassembly of equipment, cleaning, preserving, boxing, packing, skidding, etc.
a. Optional requirements. Paragraphs 14-18 of this manual pertain to preparation for shipment, inspection at storage points, protection, and maintenance in storage, etc. The question of including these paragraphs as contractual articles depends on whether the equipment is to be maintained in storage in a contractor’s plant or *901 shipped to another storage site, as well as on the type of storage conditions encountered.
18. Paragraph 12 of ordm N6, with many sub-paragraphs covering 10 pages of closely printed materials, provides detailed standards for the cleaning and preserving of various kinds of production equipment. These standards required a great deal of disassembly. They also required a great amount of cleaning of internal assemblies. There is no mention in ordm 4-6 of cleaning in accordance with good commercial shop practice.
19. Toward the middle of December 1957, the first units of production equipment had been received at Michoud Ordnance Plant. When they were offered for inspection, they were rejected by the government inspector who had been told by his superiors that “the contract would be done according to ORDM 4G6.”
20. On December 26, 1957, Mr. S. L. Moyers, officer in charge of the Michoud facility wrote to the commanding officer of bhod, stating that the performance of work by the plaintiff “does not meet the requirements of ordm 4-6 and Appendix I”, that he had spoken to Mr. Shaw about a week earlier but that Shaw said that the provisions of ordm 4-6 were not applicable except as delineated in Appendix I and that other work would be performed according to commercial practice. Shaw also said that the contract had been negotiated on this basis. The letter contained a request that the plaintiff be given written notice at once that its performance was contrary to the terms and conditions of the contract and requesting full compliance without delay.
21. The commanding officer of bhod, (the contracting officer) sent a letter to the plaintiff dated Dec. 31,1957, which reads as follows:
The Acting Officer-in-Charge at U.S. Army Ordnance Plant, Michoud, has notified this office that certain items of equipment being preserved for long term storage by your company under the subject contract are being processed according to standards not acceptable to the Government and not in accordance with the provisions and applicable specifications of Contract da-01-009-ord-592.
Although the items to which reference is made have *902 not been offered for final acceptance it is considered expedient and necessary that the matter be brought to your attention in order that processing of equipment may be made to conform with the provisions of oedm 4-6 as required by the contract.
For specific instances of deviation as noted by the Officer-in-Charge it is suggested that your supervisory personnel in charge of that portion of the work presently being performed at U.S. Army Ordnance Plant, Mi-choud, contact Mr. S. L. Moyers, Officer-in-Charge (Acting).
Your immediate attention to this matter is solicited.
22. Although there were discussions[3] between plaintiff’s representatives and defendant’s representatives, and letters written back and forth, it was the position of the plaintiff that the contract clearly required it to skid the machines in accordance with ordm 4-6, but that cleaning of the machines was to be in accordance with good commercial practice only, as indicated in Appendix I of the contract. The position of the government boiled down to the proposition that all of the work, with exceptions not here pertinent, was to be performed in accordance with the standards of ordm 4-6.
23. On February 4, 1958 the contracting officer wrote a letter to the plaintiff which was a denial of its request for pay for extra work which it was being required to do by the Government’s interpretation of the contract. Thereafter, an appeal was had to the Armed Services Board of Contract Appeals, which was denied.
24. On February 5, 1958, the plaintiff instructed its work crews, through its foremen, to keep separate costs on doing the work in accordance with its contract as interpreted by the plaintiff (with cleaning in accordance with good commercial shop practice) and on doing the work in accordance with ordm 4-6. This was accomplished.
25. At no time during the contract negotiations did Mr. Haworth have any discussion with plaintiff’s representative concerning ordm 4-6.
*903 26. It was tlie intention of the plaintiff, when entering into the contract, to clean the machines by blowing out the chips, and cleaning the exterior critical surfaces by wiping them off with rags, using a solvent with the rags.
27. The plaintiff company and its officers have had wide experience in performing work of plant clearance of production machinery. The firm is, and for many years has been, a contract operator for Cleveland Ordnance District of a very extensive machine tool storage activity at Lordstown, Ohio, having something over one million feet of floor space with 10,000 machine tools in storage at the time of the trial of this case. It was thoroughly familiar with standards for cleaning and preserving of production equipment contained in ordm; 4-6. Much of the machinery stored at Lordstown, supposedly for long-term storage, had not been subjected to cleaning and preserving in accordance with ordm 4-6.
28. The plaintiff performed the work to the satisfaction of government inspectors who had made it quite clear that, with exceptions not here pertinent, it had to be accomplished in accordance with ordm 4-6.
29. The contract between the plaintiff and the defendant was amended by the deletion of work on the items contained in Exhibit B to Appendix I as the facilities therein listed were sold by the defendant at the Englander plant. This resulted in a decrease in contract price of $7,922. The contract price was further decreased by $12,000 which was due to additional rent payable by the defendant to Englander which the plaintiff had agreed to defray. For the work performed by the plaintiff under the contract, it has been paid $144,797.
30. In complying with the defendant’s directives to perform the work in accordance with ordm 4-6, the plaintiff expended the sum of $43,816.86 for labor, supervision and materials. Adding the applicable 102.1 percent overhead[4] and 10.6 percent profit, the total of plaintiff’s direct costs, overhead and profit for doing the work referred to above, was $82,376.86.
*904 CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and therefore the petition is dismissed.

 See Finding No. 3.

 Robert Shaw, plaintiff’s vice-president, said in Ms testimony before tie Board of Contract Appeals that one of the Englander officers told him about the two contracts plan. Page 21, Record of the Armed Services Board of Contract Appeals, filed as joint exhibit before the Commissioner.

 See Finding No. 27.

 See Finding No. 6.

 See Finding No. 18.

 See Finding No. 26.

 Record of Commissioner, pp. 451-454.

 See Finding No. 3.

 Michael Haworth, government contract specialist at Birmingham Ordnance District, said in his testimony before the Commissioner that Birmingham Ordnance changed its plans because of a directive instructing the Ordnance Districts to discontinue the practice of having such equipment rehabilitated before placing it in storage. Record of Commissioner, pp. 282-285.

 See Finding No. 5.

 See Finding No. 5.

 See Rinding No. 5.

 Shaw’s testimony before the Board of Contract Appeals indicates that in January, 1958, two months after the contract negotiations, Shaw was still under the impression that there would be a second processing contract. See Record, note 2 supra, p. 90.

 See Findings Nos. 7, 8, 10, 11.

 See Finding No. 13, and note 13, supra.

 See Findings Nos. 19, 20.

 The contracting officer’s decision took the form of a letter of February 4, 1958, which read in part:
"The minimum acceptable standards to which the Government will accept work and services under Contract DA-01-009-ORD-592 will be that cleaning which will allow the application of preservatives internally and externally for long-term storage under conditions of controlled humidity to the extent that such preservation will be in accordance with ORDM 4-6 and all other terms of the contract.
“Workmanship and services which lead to results less satisfactory than under the foregoing procedures will not be accepted as compliance with the contract.” (Board Exhibit 9.)
The government witnesses interpreted this to mean the cleaning must be of OREM 4-6 quality in order to accomplish ORDM 4-6 preservation while implying that ORDM 4-6 cleaning procedures need not be followed.

 Government witnesses testified that plaintiff’s crew did use steam-cleamng and that the end result was compatible with ORDM 4r-6 standards. Board Record, note 2 supra, pp. 444-446.

 Since the interpretation of the contract provision is a question of law, this court is obligated to reach its own conclusion on that issue. See Wm. A. Smith Contracting Co. v. United States, 155 Ct. Cl. 44, 48, 292 F. 2d 854, 857 (1961). We have considered the evidence in both records, the opinion of the Board of Contract Appeals, and the report of our Commissioner in reaching our conclusion.
The Board record was introduced as a joint exhibit in the proceedings before our Commissioner. Neither party objected to the introduction of new evidence before the Commissioner although they were aware that the question of the propriety of taking additional evidence was then being litigated in the united States Supreme Court. After the Supreme Court announced its decision in United States v. Carlo Bianchi & Co., 373 U.S. 709 (1963), the government moved to strike all of the new evidence which the Commissioner had received. The Commissioner denied the government’s motion in an opinion dated August 22, 1963. The Commissioner held that the government’s failure to object to the new evidence at the time of its introduction constituted a waiver of the Bianchi objection within the meaning of this court’s decision in Stein Bros. Mfg. Co. v. United States, 162 Ct. Cl. 802, 337 F. 2d 861 (1963). The government has not appealed from the Commissioner’s ruling. Therefore, we have considered the evidence in both records.

 Robert Bockewitz, Chief of the Standards Branch, Engineering Division, Army Production Equipment Agency, testified in the hearings before the Commissioner that the preservative material would not be effective to prevent rust if the machines were not thoroughly cleaned before the preservative was applied. He also said that such rust is likely to cause substantial damage to precision instruments and that over half of the production equipment from the Englander Company falls into that category. Record of Commissioner, pp. 811-815.

 See Board Record, note 2 supra, pp. 166-168.

 See Bockewitz testimony at pp. 823-825 of the Record of the Commissioner.

 The December la memorandum was Introduced into evidence as Defendant’s Exhibit 8.

 The court has adopted the recommended findings of the commissioner except that Findings Nos. 18, 26, and 27 have been revised to omit the commissioner’s conclusions as to the meaning of commercial shop practice cleaning.

 Except that Exhibit A and Exhibit B listing the individual items of equipment have been omitted.

 DD Form 351 was the face sheet of the contract, dd Form 352 was the last sheet and signature page. Exhibits A and B were lists of machinery.

 Mr. Haworth, the defendant's negotiator, seemed to tafce little part in such discussions.

 Applied against labor and supervision amounting to $30,034.21.