**LEAR SIEGLER MANAGEMENT SERVICES CORPORATION, Appellant,**

v.

**The UNITED STATES, Appellee.**

**No. 88–1469.**

United States Court of Appeals, Federal Circuit.

Feb. 8, 1989.

John R. Thompson of Thompson & Haizlip, Edmond, Okl., for appellant.

Anthony H. Anikeef of the Commercial Litigation Branch, Dept. of Justice, Washington, D.C., for appellee. With him on the brief were John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, and M. Susan Burnett, Asst. Director.

Before FRIEDMAN, NEWMAN and BISSELL, Circuit Judges.

FRIEDMAN, Circuit Judge.

This is an appeal from a decision of the Armed Services Board of Contract Appeals rejecting a contractor's appeal from a contracting officer's decision denying the contractor a price increase under the contract. The ground of the Board's decision was that the contractor had failed to prove that it relied on its interpretation of an ambiguous contract provision in preparing its bid. *Lear Siegler Inc./Management Servs. Div.*, 88–2 B.C.A. (CCH) ¶ 20,642 (Feb. 26, 1988) [1988 WL 44423]. We affirm.

I

In September 1983, the Air Force issued a solicitation for the maintenance and operation of the motor pool at Tinker Air Force Base. The successful bidder would be required to "furnish all personnel, equipment, repair parts and supplies ... [and] to manage and operate vehicle maintenance, vehicle operations and transportation analysis" at the base.

The solicitation contained a number of technical exhibits that provided detailed information on the nature of the maintenance work that would be required under the contract. Technical exhibit 8 contained the Air Force's "Estimated Workload Data For Maintenance Including Vehicle Parts." The exhibit described the number of monthly work orders processed over a given 12–month period for each of the different types of vehicles at Tinker, the manhours needed to maintain the vehicles over that period, and the monthly cost of the parts used in making the repairs. The solicitation also included a special provision, entitled "Variation in Workload," which provided in part:

> If at the end of a contract period the number of vehicle maintenance work orders, ... varies above or below 15 percent from the total estimated contract workload, negotiations for an equitable price adjustment may be initiated by either party. Any increases or decreases in price shall be based on the net of all increases or decreases in this workload. Adjustment to the contract price shall be made only for that portion of the total net increase or decrease in excess of 15 percent.

The solicitation did not define the term "maintenance work orders," and no explicit distinction was made between major and minor maintenance work orders. The solicitation referenced a number of Air Force manuals, including volumes I–III of Air Force Manual (AFM) 33–710, that were to serve as a guide in construing the terms of the solicitation. Portions of these manuals are pertinent to this appeal.

Volume II of AFM 33–710 defined "work order" as "[a] specific or blanket authorization to perform certain work.... [which] is usually broader in scope than a job order, but is sometimes used synonymously with job orders." Chapter 4 of Volume II defined major maintenance and minor maintenance. In general, minor maintenance is work that "take[s] one direct labor-hour or less, and that use[s] only low-cost bench stock parts or material," and major maintenance is maintenance work that is not minor in nature. Chapter 6 of Volume II required that all maintenance work be "entered on a work order, AF Form 1823 or 1827."

Air Force (AF) Form 1823, entitled "Vehicle and Equipment Work Order," was the form used to record major maintenance work, and AF Form 1827, entitled "Minor Maintenance Work Order," was the form used to record minor maintenance work. AF Form 1827 contains 18 horizontal lines to be used for the recording of minor maintenance work. Minor maintenance that was performed on anywhere from 1 to 18

different vehicles could be recorded on AF Form 1827.

At a pre-bid conference, attended by the appellant, a bidder asked the Air Force representative whether the work order data in technical exhibit 8 included both major and minor work orders. The Air Force response was "Yes, minor maintenance work orders are included." 88–2 B.C.A. (CCH) ¶ 20,642 at 104,341.

There were 10 bidders on the Tinker contract. The appellant was the second lowest bidder. In preparing its bid, the appellant drew on the experience it had gained in performing a similar motor pool maintenance contract at another Air Force Base, the Warner Robins Air Force Base. Except for the number of vehicles, the Tinker motor pool "was an exact replica" of the one at Warner Robins.

To determine its bid, the appellant performed a comparison analysis between the Warner–Robins motor pool and the one at Tinker. The appellant reviewed the workload data in technical exhibit 8 for indications of fluctuation in workload due to "dumping"—a situation where the Army deferred certain work and submitted it to the motor pool all at one time. The appellant found the workload at Tinker to have been fairly uniform over the period exhibit 8 covered.

The appellant was awarded the Tinker contract on November 16, 1983, after the low bidder withdrew. The appellant began performance of the contract on January 1, 1984, and almost immediately began experiencing problems in meeting its maintenance schedule due to the high backlog of vehicles that needed repair. The appellant filed a request, which the Air Force denied, for an extension of the time allowed under the contract for it to bring the Tinker fleet to an acceptable quality level.

On February 28, 1984, the appellant informed the Air Force contracting officer that the number of major and minor work orders processed in January 1984 was almost twice the number shown in technical exhibit 8. On March 28, 1984, the appellant informed the contracting officer that the number of work orders processed during the first three months of the contract was nearly double the number in technical exhibit 8.

On May 30, 1984, the appellant submitted a proposed price adjustment, as provided for under the contract's Variation In Workload clause, to cover the increased cost associated with the extra workload. The appellant claimed that the number of work orders issued between January 1 and March 31, 1984, exceeded by 2,453 the average number of work orders set out in technical exhibit 8, increased by 15 percent. The appellant had calculated this number by counting each line-item on the Form 1827 as a separate minor maintenance work order.

The Air Force asked the appellant to provide a breakdown of its work order count into major maintenance work orders and minor maintenance work orders. Appellant submitted a list of all work orders it had processed over the three-month period but did not provide a breakdown of the list into major and minor categories.

At a July 15, 1984 meeting with the Air Force contracting officer, the appellant asked the contracting officer for her definition of what constituted a minor maintenance work order. The contracting officer replied that a minor maintenance work order was a work order which takes "one hour or less of maintenance time and cost [less] than 20 dollars." The contracting officer took the position that only major maintenance work orders would be counted for purposes of invoking the Variation In Workload provision.

After consulting with the Vehicle Transportation Chief at Warner Robins Air Force Base, the contracting officer learned that, at Warner Robins, each 1827 form, and not each line-item on the form, was counted as one minor maintenance work order.

In a preliminary determination, the contracting officer informed the appellant that its method of counting minor maintenance work orders—each separate entry on AF Form 1827 as one work order—was incorrect, and that because under the proper method of counting the number of work orders was within the 15 percent variation provided in the Variation In Workload

clause, the appellant was not entitled to a price adjustment. The appellant requested that the contracting officer reconsider her decision, urging that its method of calculation was correct because the 1827 forms had room for 18 line entries "to document workorders [for] different vehicles or repair actions," and that "[t]he form ... dictates that each entry is a separate workorder [because] Column 2 is *entitled* Workorder Number."

The contracting officer sought the advice of the Air Force Logistics Command at Wright–Patterson Air Force Base whether "each line entry on the AF Form 1827 is counted as a separate work order." The Air Force Logistics Command responded that "[a]n AF Form 1827 is opened at the start of the work day and closed at the end of the work day. Even though up to eighteen vehicles may receive minor repair on that workorder during the work day, the open [sic] and closure of that AF Form 1827 constitutes one workorder." The contracting officer then issued her final decision denying the appellant's claim for a price adjustment.

The appellant appealed that decision to the Armed Services Board of Contract Appeals (Board). With respect to the issue before us, the Board denied the appeal. It held that although the term "vehicle maintenance work order" for purposes of the Variation In Workload clause is latently ambiguous and that the appellant's interpretation of the term was reasonable, the appellant had failed to show that it had actually and reasonably relied on its interpretation of the ambiguity at the time of bidding. 88–2 B.C.A. (CCH) ¶ 20,642 at 104,350–51. The Board further held that:

> In this case, in bidding, LSI [the appellant] looked at the Technical Exhibit 8 workorder numbers for signs of fluctuation. There is no evidence that it interpreted each line-entry on AF Form 1827 as a separate workorder for purposes of the Variation In Workload clause adjustment.

88–2 B.C.A. (CCH) ¶ 20,642 at 104,351.

## II

A. We agree with the Board that, contrary to the appellant's contention, the term "vehicle maintenance work order" was ambiguous.

Each party can point to material that supports its interpretation of the proper method under the contract for counting minor maintenance work orders. The solicitation did not define "work order." The Air Force's response to the question posed to it during the pre-bid conference that the work order data in technical exhibit 8 included both major and minor maintenance work orders did not address the question of what constituted a minor maintenance work order. The Air Force manuals, referenced in the solicitation, provided a definition of work order that is broad enough to encompass both the appellant's and the government's interpretation.

Other references to the Air Force manuals, defining minor maintenance work and providing that an AF Form 1827 is to be used in the recording of such work, do not clarify the precise point of contention between the appellant and the government— whether the entire Form 1827, or each line-entry on the form, is to be counted as a separate minor maintenance work order. There was evidence before the Board of the conflicting government practice for counting minor maintenance work orders. The government counted each 1827 Form line-entry as a work order in preparing its "Vehicle Management Report," a monthly summary of vehicle maintenance and cost data. The contracting officer concluded that each Form 1827 was counted as one minor maintenance work order only after being informed of the practice at Warner Robins.

B. "It is well settled that where a contractor seeks recovery based on his interpretation of an ambiguous contract, he must show that he relied on this interpretation in submitting his bid." *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed.Cir.1986). *See Dale Ingram, Inc. v. United States*, 475 F.2d 1177, 1185, 201 Ct.Cl. 56 (1973); *WPC Enterprises, Inc. v. United States*, 323 F.2d 874, 876, 163 Ct.Cl. 1 (1963); *Randolph Engineering*

*Co. v. United States,* 367 F.2d 425, 430, 176 Ct.Cl. 872 (1966) (dicta). Appellant has attempted to show that it relied generally on the solicitation's Variation In Workload clause in preparing its bid, and argues that was sufficient reliance for it to prevail. What the appellant needed to prove in order to prevail, however, was that it relied on its interpretation of the ambiguous term in the Variation In Workload clause and not simply that it relied on the clause itself.

The Board found that the appellant had offered no evidence to show that, in preparing its bid, it had relied on its interpretation that every line-entry on AF Form 1827 was a separate work order, or that it had relied on the work order data presented in technical exhibit 8. The evidence indicated that the appellant had examined the work order data in technical exhibit 8 for signs of workload fluctuation, but had not actually based its bid on the data presented in that exhibit. The actual basis on which appellant prepared its bid was its prior experience with a similar contract at Warner Air Force Base.

The Board's finding that the appellant had not shown that, in preparing its bid, it relied on its interpretation of the ambiguous contract term is supported by substantial evidence.

The decision of the Board insofar as it denied the appellant's appeal is AFFIRMED.