**ASTRO–SPACE LABORATORIES, INC.**

v.

**The UNITED STATES.**

No. 133–70.

United States Court of Claims.

Dec. 12, 1972.

Morris H. Knight, Atlanta, Ga., Atty. of record, for plaintiff.

Raymond B. Benzinger, Dept. of Justice, Washington, D. C., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant. Thomas W. Petersen, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner Joseph V. Colaianni with directions to prepare and file his opinion on the issues of plaintiff's motion and defendant's cross-motion or summary judgment under the order of reference and Rule 166(c). The commissioner has done so in an opinion and report filed on April 21, 1972, wherein such facts as are necessary to the opinion are set forth. Plaintiff filed a request for review by the court of the commissioner's opinion and recommended conclusions, defendant urged their adoption by the court and the case has been submitted to the court on the briefs of the parties and oral argument of counsel. Since the court agrees with the opinion and recommendations of the trial commissioner, it hereby adopts the same as the basis for its judgment in this case as hereinafter set forth. Therefore, plaintiff's motion for summary judgment as to plaintiff's claim is denied and defendant's cross-motion thereon is granted with dismissal of the petition to be withheld pending final disposition of defendant's counterclaims; defendant's cross-motion for summary judgment on its first counterclaim is granted and judgment will be entered for defendant in the sum of $11,844 thereon upon final disposition of defendant's second counterclaim; and, defendant's cross-motion for summary judgment on its second counterclaim with respect to plaintiff's liability for

breach of contract is granted with the case remanded to the trial commissioner for further proceedings to determine the amount of recovery, if any, pursuant to Rule 131(c)(2).

## OPINION OF COMMISSIONER

COLAIANNI, Commissioner:

This case, which is before the court on cross-motions for summary judgment, arises out of a fixed-price production contract, dated May 13, 1968, awarded plaintiff by the National Aeronautics and Space Administration's Marshall Space Flight Center, hereinafter referred to as the Space Center or MSFC. The purpose of the contract was the procurement of 48 titanium alloy spar ring fittings for use with an Apollo telescope mount in the Saturn V program.

The parties seek a review of a decision rendered by the NASA Board of Contract Appeals in NASA BCA Nos. 1168–19 and 469–3, which were consolidated by the Board for purposes of trial. By way of NASA BCA No. 1168–19, plaintiff sought a review by the Board of the contracting officer's termination for default of contract NAS8–23774. By NASA BCA No. 469–3, plaintiff appealed to the Board from the contracting officer's assessment of excess costs for reprocurement of the titanium fittings.

Plaintiff, by this action, seeks a review, in accordance with the Wunderlich Act, 41 U.S.C. §§ 321 and 322, of the decision of the Board of Contract Appeals, upholding the contracting officer's termination of the contract for default. Defendant, by its first counterclaim, seeks, under the provisions of 41 U.S.C. §§ 321 and 322, the sum of $11,844 for excess costs incurred in connection with reprocurement of titanium fittings from Cullman Avionics, Inc. By its second counterclaim, defendant requests, partially under and partially outside the Wunderlich Act, damages allegedly incurred, as a result of plaintiff's breach

of the contract, in connection with reprocurement costs for titanium fittings from the Atomic Energy Commission's Oak Ridge facilities.

## Background Facts

On April 8, 1968, requests for proposals, hereinafter referred to as RFP's, were sent by the Space Center to 10 potentially interested companies. By the closing date of the RFP's, April 22, 1968, responsive bids had been received from eight manufacturers. The RFP, as well as the subsequent contract, called for 24 titanium alloy sparring fittings to be manufactured in accordance with MSFC Drawing 30M14708–1 and an additional 24 fittings were to be manufactured to meet the specifications of MSFC Drawing 30M14708–2.

Of the responsive bids, plaintiff's at $33,408 was the lowest. The next two lowest bids were $40,416 and $54,432. Because of the wide difference between NASA's projected price of $50,000 and plaintiff's bid, plaintiff was given an opportunity to reconsider. After reevaluation, plaintiff requested that its bid be increased to $36,748.80.[1] As a result of its low bid plaintiff, on May 13, 1968, was awarded the Negotiated Supply Contract NAS8–23774.

Five printed notes appear on the MSFC Drawings 30M14708–1 and 30M14708–2. Two of the five notes, Nos. 3 and 4, were flagged to indicate their importance.

Note No. 3 directed that the fittings be made from a particular titanium alloy, and read as follows:

3. TITANIUM ALLOY 6AL–4V BAR STOCK PER MIL–T–9047, CLASS 5.
[A8001]

Military specification MIL–T–9047D, entitled "titanium and Titanium Alloy Bars, Forgings, and Forging Stock," sets forth the military standard for un-

---

1. This bid was later decreased, because of a minor modification, to $36,720.

alloyed titanium and titanium alloy bars, forgings, and forging stock.

Note No. 4 directs that the titanium used in the finished fittings be heat treated to a specified strength property. Particularly, Note No. 4 reads as follows:

▷4.▷ HEAT TREAT PER MIL-H-81200 to 135,000 PSI TENSIL YIELD STRENGTH?[2]
[A8002]

MIL-H-81200 is a military specification which was intended to cover—

\* \* \* furnace equipment requirements and test procedures, heat treating procedures, heat treating temperatures, and general information for the heat treatment of titanium and titanium alloy items used in the construction of military weapons. It also describes procedures which, when followed, have produced the desired properties within the limitation of the respective alloys.

Plaintiff's plan for manufacturing the parts called for purchasing titanium billets, which had been heat treated to the requisite hardness, from Titanium Sales Corp. of North Hollywood, California. The billets were then to be machined to conform to MSFC Drawings 30M14708-1 and 2, by Dyna-Tech, Inc., of Decatur, Alabama. Thereafter, plaintiff intended to inspect and test the finished product prior to delivery to the Space Center.

Plaintiff entered into the performance of the contract and encountered no difficulties until approximately June 25, 1968, when it sought to correct a minor error in the drawings. It was at this time that plaintiff for the first time questioned the meaning of the phrase "tensile yield strength" in Note No. 4 of the drawings. As a result of discussions between the parties, a Contractor Drawing Change Request (hereinafter referred to as CDCR) corrected the drawing error and also modified Note No. 4 to read:

▷4.▷ HEAT TREAT PER MIL-H-81200 to 135,000 PSI YIELD STRENGTH
[A8003]

Plaintiff, in evaluating the effect of the changes at the time the CDCR was submitted, estimated that they would have no impact on the cost of the fittings or on the delivery schedule. The drawing correction was of a minor nature and presented no problems. It accordingly plays no part in this case, or for that matter, in the contracting officer's action or the Board's decision. However, plaintiff's estimates of the effect of the modification to Note 4 proved to be unrealistic and form the basis for the present controversy.

The Note 4 change forced plaintiff to modify its original plan for producing the fittings. After several alternate plans for producing the fittings failed, plaintiff attempted to persuade the Space Center to relax the Note 4 yield strength requirements. Finally, on September 11, 1968, plaintiff officially notified the Space Center that work under the contract had ceased. The letter contended that the design of the part prevented it from meeting the changed Note 4 strength requirements. Further, the letter suggested that the contract be either:

(a) terminated for the convenience of the Government, or

(b) modified to a cost basis.

Plaintiff's position was further elaborated on in its September 17, 1968, letter to MSFC. Particularly, plaintiff called upon MSFC to select either of the above-suggested alternatives, since the change to Note 4 made the contract impossible to perform. Plaintiff also stressed that its original bid was made under the assumption that the Space Center had developed a process for fab-

---

2. "Tensil" is a misspelling of the word "tensile." The correct spelling is used throughout this report.

ricating the part to the strength required.

At a September 27, 1968, meeting between key personnel of plaintiff and the Space Center, plaintiff was told that it could not expect to receive manufacturing information because the contract merely required a production of parts by standard state of the art techniques. Plaintiff nonetheless was told the MSFC had placed an informal work order with the Atomic Energy Commission's (hereinafter referred to as AEC) workshop at Oak Ridge. The work order called for the manufacture of one fitting and the collection of detailed production data relating thereto. While the Space Center would not agree to supply plaintiff with the AEC production data, it did agree to provide plaintiff with the names of the AEC personnel responsible for the production of the fitting to enable plaintiff to contact them on its own. Plaintiff was also advised that it was expected to meet its contract commitments.

By letter of September 30, 1968, plaintiff was given 10 days to show cause why a default termination should not be issued against it.

Plaintiff, on October 1, 1968, again wrote to MSFC and, after stating that the production of the fittings required techniques beyond those known in the art, requested that it be supplied with all production information which MSFC had in its possession.

On October 14, 1968, plaintiff, in replying to the Space Center's show cause letter, attributed its failure to perform on:

(a) the failure of its subcontractor, Dyna-Tech, Inc., to complete its contract; and

(b) the impossibility of performing the requirements of the MSFC contract.

Plaintiff, on October 30, 1968, was notified by the contracting officer that its right to proceed on contract NAS8–23774 was terminated for default.

Plaintiff was also told that the fitting would be procured on the open market and that it would be liable for any excess costs. Plaintiff was further advised that defendant did not waive any of its other rights and remedies against plaintiff.

On November 26, 1968, plaintiff timely filed an appeal, NASA BCA No. 1168–19, from the contracting officer's holding with the NASA Board of Contract Appeals.

Under the terms of the contract, plaintiff had agreed to a schedule that required the delivery of all the fittings by September 30, 1968.[3] At the time of termination of the contract, October 30, 1968, plaintiff had not delivered a single part. Defendant, on October 31, 1968, immediately set out to reprocure the fittings in order to meet a fast approaching December 15, 1968, use date. However, defendant concluded that the short time remaining did not permit setting into motion a competitive bid process for reprocurement of all of the needed fittings. Instead, since the AEC's Oak Ridge facility had been working on the production of one fitting, defendant concluded that it might still be able to meet its critical use date if the AEC's work order could be enlarged to call for 11 fittings, the minimum number of fittings that were absolutely needed by December 15, 1968.

At the same time, defendant proceeded with the more time-consuming competitive reprocurement of the remaining 38 parts. The record shows that the AEC did produce, at a cost of $31,704.92, 11 fittings in time for the critical use date. Moreover, the remaining 38 fittings were competitively reprocured from Cullman Avionics, Inc., at a cost of $48,564. On March 24, 1969, the contracting officer outlined the above reprocurement costs, and after subtracting the amount of plaintiff's contract, $36,720, demanded excess costs of $40,666.60 from plaintiff.

---

3. The original contract called for final delivery to be made by September 3, 1968.

On March 27, 1969, plaintiff filed an appeal, NASA BCA No. 469–3, from the contracting officer's assessment of consequential excess costs. Upon request, the Board agreed to the consolidation of cases NASA BCA Nos. 1168–19 and 469–3 for purposes of trial. The Board on January 28, 1970, reached, *inter alia,* the following conclusions:

(1) That the term "Tensile Yield Strength" specified in the drawings of the contract is not ambiguous and plaintiff's interpretation was not reasonable;

(2) That the CDCR did not make compensable changes in the contract requirements;

(3) That even assuming that the drawing changes did change the contract requirements, plaintiff's admission that the changes would not affect the contract cost or delivery dates amounted to a waiver of any right it may have had to compensation;

(4) That the CDCR did not make the contract practically impossible of performance; and

(5) That defendant is entitled to the excess costs incurred as a result of the reprocurement from Cullman Avionics, Inc., but it cannot recover for costs of AEC reprocurement.

Plaintiff argues that the Board's decision was arbitrary or capricious, not supported by substantial evidence, and contained errors of law in rejecting plaintiff's reasons for failing to deliver the fittings and in upholding the contracting officer's termination for default. More particularly, plaintiff argues that:

(1) The Board erred in its conclusion that the terms of the contract in dispute were not ambiguous; and

(2) The Board erred in its conclusion that plaintiff waived its right to an equitable adjustment under the changes clause by agreeing to a drawing change.

Each of these points, along with defendant's counterclaims, will now be treated in considerable detail.

### I. *The Ambiguity Issue*

One basis for plaintiff's urging that the Board erred in upholding the contracting officer's termination of the contract for default is its fundamental contention that the term "tensile yield strength," as used in Note 4 of MSFC Drawings 30M14708–1 and 2, is ambiguous. Plaintiff urges that the phrase is reasonably susceptible of being interpreted to mean "tensile strength," and that it so construed the phrase between the time of the awarding of the contract and the execution of the CDCR. Defendant, on the other hand, urges that the phrase can only mean "yield strength in tension."

The Board specifically concluded that the phrase "tensile yield strength" was not ambiguous, and that as it was used in Note 4, it could only reasonably mean, as defendant urged, that the fittings to be furnished were to have a yield strength of 135,000 PSI. Thus, the Board concluded that the plaintiff's contentions of ambiguity " * * * did not constitute an excuse for appellant's failure to perform as beyond its control and without its fault."

Plaintiff urges that the decision by the Board—

* * * that the terms of the contract in dispute were not ambiguous is a finding of fact that is not supported by the evidence and is arbitrary and capricious; is based on an erroneous interpretation of the specifications and is wrong as a matter of law, and not entitled to finality.

Resolution of this issue once again involves the familiar question of interpretation of contract specifications. A finding by an administrative board that a contract specification is, or is not, ambiguous constitutes an interpretation of a contract. It is a well-established principle that a question involving the interpretation of a contract is a question of law, and a board's prior decision is not binding on this court, or entitled to

finality.[4] However, it is equally well established that underlying factual determinations of a board, even though they relate to a question of contract interpretation, are entitled to finality if they are supported by substantial evidence.[5]

■ To support its contention that the phrase "tensile yield strength" is ambiguous, and could reasonably be construed to mean "tensile strength," plaintiff relied on the testimony of three of its employees. In substance, the record shows that these witnesses testified that the mechanical property of a metal is conventionally expressed on drawings in terms of "tensile strength," "yield strength," or "Rockwell hardness." Moreover, these same witnesses testified that they had never seen the desired mechanical properties of a part expressed on a drawing by the phrase "tensile yield strength." They further testified that the most commonly specified property of a metal is "tensile strength."

In addition, plaintiff points out that MIL–T–9047D, the standard specification on titanium materials that is incorporated by reference in the contract by Note 3, lists the various properties in terms of "yield strength" or "tensile strength," but not by the phrase "tensile yield strength." Referring also to the "certificates of test" which accompanied the billets of titanium that it purchased from Titanium Sales Corp., plaintiff stresses that these certificates indicate the properties of the metal in terms of "tensile" and "yield" strength only. Plaintiff thus urges that it was reasonable for it to interpret Note 4 to mean 135,000 PSI "tensile strength."

. Defendant's witnesses, on the other hand, testified in substantial opposition to the points urged by plaintiff. In substance, defendant's position is that the phrase "tensile yield strength" is a technical term that is well known in the titanium industry, and that the only possible thing that it could mean was that the part was to have a specified yield strength when subjected to a tensile force. Contrary to plaintiff's position that the contract term was ambiguous defendant contends that the use of the term "yield strength" alone would be ambiguous since it would not be known if the strength was in relation to a compressive or tensile force. Witnesses for defendant also explained that the reason MIL–T–9047D only indicates "yield" and "tensile" strengths is because the specification deals with mechanical properties of metals that are subject only to tension testing.

■ Defendant also submitted into evidence numerous technical publications dealing with both the mechanical properties of metals generally and with the mechanical properties of titanium specifically.[6] The publications use nomenclature such as "tensile yield strength," "compressive yield strength," and "ultimate tensile strength" to describe the mechanical properties of titanium.

On balance, plaintiff's arguments are unpersuasive. After careful consideration of the evidence before the Board, it is concluded that the term "tensile yield strength" is a technical term with the well-established industrial meaning of yield strength under tension.

4. Martin Lane Co. v. United States, 432 F.2d 1013, 1015, 193 Ct.Cl. 203, 206–207 (1970).

5. D & L Constr. Co. v. United States, 402 F.2d 990, 993, 185 Ct.Cl. 736, 743 (1968).

6. Plaintiff now objects to the reliance of the Board on these sources, citing Duhame v. United States, 119 F.Supp. 192, 195, 127 Ct.Cl. 679, 683 (1954), for the proposition that if a term in a contract is unambiguous, as the Government claims, resort may not be had to extrinsic materials to explain its meaning. However, it is well established that evidence of trade usage and custom may always be used to explain or define contract language, but it may not be used to vary or contradict the terms of a contract. See W. G. Cornell Co. v. United States, 376 F.2d 299, 311, 179 Ct.Cl. 651, 669–671 (1967); Gholson, Byars & Holmes Constr. Co. v. United States, 351 F.2d 987, 999–1000, 173 Ct.Cl. 374, 395–396 (1965).

Plaintiff's contentions concerning the ambiguity of the contract are also found to be unmeritorious because they require a strained reconstruction of the term at issue. It is significant that in order to interpret the phrase "tensile yield strength" to mean, as plaintiff argues, "tensile strength" requires the word "yield" be ignored or cast aside. To the contrary, interpreting the phrase, as defendant urges it should be, to mean yield strength under tension, gives meaning and significance to each of the words.

In order to create the ambiguity which plaintiff urges exists, it is necessary to twist and/or ignore a part of the allegedly ambiguous phrase. This court has long ago established that such a construction is not acceptable. See Bishop Engineering Co. v. United States, 180 Ct.Cl. 411, 416 (1967).

Still further reason for finding plaintiff's allegation of contract ambiguity to be unsound is the failure of plaintiff to show that its interpretation was reasonable. In order to conclude that plaintiff's interpretation of the phrase was reasonable, it is necessary to justify plaintiff's total failure to take into consideration the word "yield." It is difficult to understand how plaintiff can urge an interpretation which would require the elimination of at least one word as reasonable. Indeed this is the type of interpretation that has consistently been found to be unreasonable. Jamsar, Inc. v. United States, 442 F.2d 930, 934, 194 Ct.Cl. 819, 827 (1971); Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 979, 169 Ct.Cl. 384, 395 (1965).

Further support for the Board's conclusion that the phrase "tensile yield strength" was not ambiguous is found from a review of the facts leading up to defendant's termination of the contract for default. As pointed out, the RFP that ultimately led to the awarding of a contract to plaintiff was forwarded to some 10 interested manufacturers. Eight responses, including plaintiff's, were received and not a single manufacturer questioned the contract specifications generally, or the phrase "tensile yield strength" particularly.

Still another reason for concluding that the Board's decision on this point is correct is the lack of convincing evidence to show that plaintiff actually relied on the construction it now urges in its performance of the contract. WPC Enterprises, Inc. v. United States, 323 F.2d 874, 876, 163 Ct.Cl. 1, 6 (1963).

Indeed, the testimony explaining how the titanium billets from which the fittings were to be machined were originally ordered by plaintiff casts considerable doubt on whether any reliance was placed on the Note 4 phrase in making up the purchase order. Plaintiff's original purchase order only called for the billets to be heat treated to "135,000 PSI minimum." The purchase order was modified and amended before it left plaintiff's plant by plaintiff's quality control manager to read: "135,000 PSI tensile strength minimum." Plaintiff's quality control manager inserted the words "tensile strength" without checking the contract or the drawing.[7]

---

7. The actual testimony of Mr. Jack Keck, plaintiff's quality control manager, who inserted the words "tensile strength" on the titanium purchase order, is somewhat at a variance from the general testimony by other witnesses of plaintiff that titanium was ordered at a tensile strength of 135,000 PSI because of an interpretation of the contract drawing phrase "tensile yield strength." Mr. Keck testified that when he reviewed the first purchase order he concluded that the term "135,000 PSI minimum" was incomplete. He therefore inserted the words "tensile strength" in the purchase order so that it would read "135,000 PSI tensile strength minimum." Upon being asked whether he compared the terminology inserted with the actual wording of Note 4 of the contract drawings, Mr. Keck testified as follows (pp. 181–182):

"A (Mr. Keck) At that time I did not, as I recall it.

"Q You just checked the word?

"A I have thought about this considerably, and I don't know exactly how I

Thus, plaintiff's argument that it was unable to perform the contract because of the ambiguity in Note 4 is unconvincing since there has been no showing that plaintiff's reliance on the phrase in issue in any way contributed to its failure to produce the fittings. Clearly, the testimony of plaintiff's quality control manager establishes that the titanium material was ordered without even referring to Note 4.

■ This court has continuously maintained that it is necessary for a contractor who is urging that a contract is ambiguous to show that it relied on its interpretation either in submitting its bid or in performing the contract. Martin Lane Co. v. United States, 432 F.2d 1013, 1015, 193 Ct.Cl. 203, 207 (1970); Randolph Engineering Co. v. United States, 367 F.2d 425, 429–431, 176 Ct.Cl. 872, 880–882 (1966).

Based on the above consideration, it is concluded that plaintiff's interpretation of the phrase "tensile yield strength" to mean "tensile strength" is not reasonable. It is further found that the Board's conclusion " * * * that Note 4 on the drawings was not an ambiguous term * * * " is correct.

## II. Note 4 Change does not Constitute a Change in Scope of Work

■ As a result of plaintiff's quality control manager's questioning the meaning of the phrase "tensile yield strength" in Note 4, a CDCR was issued on June 26, 1968. This CDCR changed the words "tensile yield strength" of Note 4 on the drawings to "yield strength." Plaintiff contends that the issuance of the CDCR constituted a change in the scope of work that it was obligated to do under the contract and that it is entitled to be compensated for such a change under the changes clause of the contract. This position is sound only if plaintiff's original interpretation of the phrase "tensile yield strength" as "tensile strength" was reasonable. Certainly, if plaintiff's original interpretation was reasonable, then it follows that the CDCR required it to produce fittings that had a yield strength of 135,000 PSI, whereas prior to the CDCR it was only required to produce fittings that had a tensile strength of 135,000 PSI. This is significant, plaintiff argues, since by the date of the CDCR it had already ordered all of the necessary titanium billets and had even begun machining the billets to the fitting specifications, but that the ordered billets were only requested to have a tensile strength of 135,000 PSI.

For reasons explained in considerable detail in the preceding analysis of Note 4 to establish if it was ambiguous, "tensile yield strength" is a technical term which has the definite trade meaning of "yield strength in tension." The phrase cannot be reasonably interpreted to mean "tensile strength." Accordingly, it is concluded that both before and after the change, plaintiff was required to produce fittings with a yield strength under tension of 135,000 PSI. While the CDCR modification to Note 4 was initiated by plaintiff, the record indicates that defendant intended the modification to be a mere restatement of the properties originally specified.

■ Based on the above facts and considerations, it becomes clear that, at best, plaintiff's interpretation of the contract requirements constitutes a unilateral mistake of facts. The defendant is not, of course, liable to a contractor for a unilateral mistake, unless it can be shown that the Government knew or should have known of plaintiff's mistake in interpretation. Jansen v. United States, 344 F.2d 363, 370, 170 Ct.Cl. 346, 356 (1965). The record establishes that the defendant first learned of plaintiff's

arrived at tensile strength. However, tensile strength * * * would be a realistic requirement in that situation. "Q Don't you think it would have been reasonable, before filling that word in

* * * to go back and look at the drawing * * * ?
"A I can't say that, whether it is reasonable or not."

interpretation when plaintiff sought clarification of the phrase on June 25 or 26, 1968. Certainly, it would be going too far, as pointed out in *Jansen, supra,* to relieve a contractor of its contractual obligations for its own unreasonable mistake of fact.

The Board found that the CDCR did not change or modify any of plaintiff's contractual obligations. From a review of the record, it appears that the CDCR did no more than to restate what plaintiff had already agreed to provide. The CDCR is found to in no way expand or change the scope of work covered by the contract. Under the circumstances, plaintiff cannot persuasively argue that it is entitled to relief or to be excused from a contract where it is merely being held to what it has already agreed to do. Indeed, this type of argument was rejected by this court in Olin Mathieson Chemical Corp. v. United States, 179 Ct. Cl. 368, 407 (1967), when it stated:

> It would be a novel doctrine indeed to allow a contractor an adjustment under the changes clause for the reason that he was compelled to live up to his contract commitments.

Nothing has been shown to indicate that a different result should be reached when a contractor, such as plaintiff in this litigation, is attempting to unjustifiably excuse a termination of a contract because of an alleged change in the scope of work required by the contract.

After a careful review of the record, it is concluded that the CDCR restatement of Note 4 did not constitute a change in the scope of work required under the contract. Further, the fact that a formal change document (the CDCR) was issued and agreed to by defendant does not alter this result, since the only work required of plaintiff was that originally called for by the contract. *Cf.* J. B. Williams Co. v. United States, 450 F.2d 1379, 1393, 196 Ct.Cl. 491, 516 (1971); Ets-Hokin Corp. v. United States, 420 F.2d 716, 190 Ct.Cl. 668 (1970).

### III. *Note 4 Change did not Render Contract Impossible to Perform*

Plaintiff stopped work on the contract on September 11, 1968, contending that the Note 4 change rendered the contract impossible to perform. This original complaint was later expanded upon, and plaintiff particularly stated that the change in Note 4 made it practically impossible to perform the contract at reasonable costs and within the time schedule agreed to. Plaintiff claims that at the time of the change it had proceeded into the machining phase of its manufacturing plan for the production of the fitting, and that it had no recourse but to finish machining the titanium billets. Plaintiff then planned to reheat the machined fittings to meet the 135,000 PSI yield strength requirement of the modified Note 4. Because of a myriad of problems it encountered, plaintiff's plan was not successful. In all, plaintiff expended approximately $40,000, which is more than the original fixed contract price of $36,720, without delivering a single fitting.

After considering all these facts, the Board concluded (NASA BCA Nos. 1168–19 and 469–3, 70–1 BCA ¶ 8107, January 28, 1970, at 37,655):

> We believe that the contract was possible of performance but the manufacturing method and procedure Appellant elected to use in trying to perform it after finding out the fittings had to have 135,000 PSI minimum yield strength instead of tensile strength and by using the titanium billets it had already purchased may have made it practically impossible to perform. The decision to follow this method of production was Appellant's decision and it assumed the risk of failure.

The question of whether a contract is factually possible or commercially practical to perform is a question of fact. A Board's findings of fact are binding on this court if they are supported by substantial evidence. Koppers

Co., Inc. v. United States, 405 F.2d 554, 558–559, 186 Ct.Cl. 142, 149–150 (1968). It is, accordingly, necessary to review the record to determine if the Board's findings are supported by substantial evidence.

 The record before the Board indicates that both the AEC's Oak Ridge facilities and Cullman Avionics, Inc., produced titanium fittings for the Space Center after plaintiff's contract was terminated for default. Moreover, the fittings produced by both the AEC and Cullman were made to specifications that were identical to those required by plaintiff's original contract. Furthermore, the record indicates that both the AEC and Cullman were able to produce acceptable fittings, within their scheduled delivery times and at reasonable costs.

This court has often held that performance of an exact same contract during reprocurement is persuasive that the contract was not impossible to perform. Astronautics Corp. of America v. United States, 436 F.2d 430, 437, 193 Ct.Cl. 910, 922 (1971).

Also persuasive on the question of whether the contract specifications were practically impossible to perform is the testimony of plaintiff's own employees. The evidence shows that plaintiff's employees testified that if plaintiff had known from the beginning that the fittings were to have a yield strength of 135,000 PSI, they would have been able to produce them. Indeed, all that would have been required, apparently, was to order the titanium billets with the proper strength properties. The billets would then have been machined to the specifications of the MSFC drawings. This differs from the procedure followed in this instance because plaintiff misinterpreted the strength requirements and thus ordered billets with the wrong properties. It turned out that plaintiff was not able to reheat-treat the parts to the desired strength condition after they had been machined from the incorrect billets.

Based on the evidence before the Board, and particularly in view of the performance by other contractors relative to the exact same contract specifications (see Astronautics Corp. of America v. United States, *supra*), it is found that the Board's decision that the contract was not impossible to perform is supported by substantial evidence.

It is, accordingly, concluded that there is substantial evidence to support the Board in its finding that the default termination was proper and that the plaintiff's allegations with respect to the procedure which the Board followed are without substance and of no judicial significance. Thus, it now becomes necessary to review the assessment of excess reprocurement costs made by the Board and, as well, defendant's counterclaim for damages for breach of contract.

IV. *The Government's Counterclaims for Excess Costs of Reprocurement and Damages for Breach of Contract*

Defendant has counterclaimed for $11,844 as the excess costs for reprocuring 38 of the 48 fittings which plaintiff failed to deliver. In addition, in connection with the separate reprocurement of the remaining 10 fittings that plaintiff was obligated to deliver, defendant has filed a second counterclaim requesting that this court find that plaintiff's default constituted a breach of contract for which defendant is entitled to be awarded damages.

Defendant moves for summary judgment on its first counterclaim contending that its right to excess costs for reprocuring 38 fittings has been administratively determined under the disputes clause of the contract and the Wunderlich Act in a manner which is binding on this court. With regard to its second counterclaim, defendant has also moved for summary judgment with respect to the question of plaintiff's liability. However, defendant argues that the amount of damages to be assessed against plaintiff for breach of con-

tract is to be determined pursuant to Rule 131(c)(2) of this court. After a brief discussion of pertinent background facts, defendant's counterclaims will be individually treated.

Since only events which occurred after the issuance of the Note 4 CDCR are relevant to defendant's counterclaims, no attempt will be made to repeat all of the background facts beginning with plaintiff's award of contract NAS8–23774. It is sufficient to recall that under the terms of the contract plaintiff was required to complete delivery of the 48 titanium alloy fittings by September 30, 1968.

For reasons previously discussed, plaintiff, on September 11, 1968, officially notified defendant, by letter, that it had stopped work on the contracts. The letter stated, in pertinent part:

> Flag 4 of the documentation B/P 30M14708, amended by CDCR dated 25 June 1968, reading:
>
> "Heat treat per MIL–H–81200 to 135,000 PSI minimum yield strength"
>
> cannot be met considering the design of the part. Astro-Space has exhausted every means to satisfy this requirement, including consultation with Titanium Material Consultants.

This was followed by plaintiff's September 17, 1968, letter wherein it repeated and expanded on the complaints in its September 11, 1968, letter and went on to state:

> In furtherance of our letter dated September 11, 1968, more particularly, the second paragraph thereof, we wish to state that it is our unqualified conclusion that the contract as presently written is impossible of performance in that the specification for heat treat is a general specification applicable to stock material of the alloy specified and not to the items to be fabricated under the contract.

\* \* \* \* \* \*

> However, since we have already expended a considerable sum and have gained some experience in attempting to produce this item, we would be most interested in continuing if the contract is modified to some form of a cost-type contract, which would assure recovery of the cost involved.

Personnel of the Space Center met on September 19, 1968, to consider plaintiff's letters of September 11 and 17, 1968. A memorandum of the meeting indicates that defendant did not agree with plaintiff's position and that a letter, complete with supporting data, was to be written in response to plaintiff's letters. After additional consideration by Space Center personnel, a meeting with plaintiff was set up for September 27, 1968. A memorandum of that meeting indicates that little of significance occurred at this meeting, and both sides appeared content to merely repeat their previous statements. However, it does appear that plaintiff was told that it could expect to receive a "show cause" letter in the near future. Plaintiff was also told of discussions between MSFC personnel and AEC personnel at the Oak Ridge facilities regarding the production of a titanium fitting to the same specifications as contained in plaintiff's contract.

On September 30, 1968, plaintiff was notified that it had failed to perform the contract within the time scheduled and that defendant was considering termination of the contract pursuant to General Provision No. 11 (Default).[8]

---

8. 11. DEFAULT

(a) The Government may, subject to the provisions of paragraph (c) below, by written notice of default to the Contractor, terminate the whole or any part of this contract in any one of the following circumstances:

(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or

\* \* \* \* \*

(b) In the event the Government terminates this contract in whole or in part as provided in paragraph (a) of this clause, the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appro-

Plaintiff was given 10 days after receipt of the notice in which to present any facts bearing on the question to the contracting officer.

Plaintiff was apparently interested even as late as October 1, 1968, with obtaining information relating to production of the fittings for on that date it wrote to the contracting officer and stated:

> Since we have previously advised that we have exhausted every available resource to produce the contract items and have been unsuccessful, and since Mr. McCullough [Contracting Officer] stated in the aforementioned meeting that he was going to issue a "show cause" letter to this company why the contract should not be terminated for default, it is requested that the Government make available to this company all information in its possession, or that may be developed by the AEC or any other Government agency in producing this item, that demonstrates that the contract is capable of performance as presently written.

The contracting officer responded to plaintiff's letter on October 11, 1968. Since both the Space Center and the Oak Ridge facilities of the AEC are Government agencies, the fitting was requested by a Government installation to Government installation "Order Type Contract." In this type of arrangement,

fabrication services are ordered on a cost reimbursement basis. It also is clear that the fitting which the AEC facility was ordered to produce was to conform to the exact same specifications as those contained in plaintiff's contract.

Plaintiff on October 14, 1968, responded to the contracting officer's "show cause" letter and after a recitation of facts, which to a great degree have already been discussed, requested that:

> * * * the Contracting Officer make a factual determination that the performance of the subject contract is a "practical impossibility" and terminate it for the convenience of the government or modify it so as to render it possible of performance.

Also relevant to these issues is an October 28, 1968, memorandum by defendant's contracting officer. The memorandum traces the pre-bid activity on this contract, and goes on to show that plaintiff requested, after failing to meet its July 29 and August 29, 1968, delivery schedule, that it be given additional time in which to deliver the fittings. Particularly, the memorandum states:

> Delivery schedule for both Items 1 and 2 was for eight (8) each July 29, 1968, eight (8) each August 29, 1968, and eight (8) each September 30, 1968. Delivery was delinquent, and telephone calls were made in order to

---

priate, supplies or services similar to those so terminated, and the Contractor shall be liable to the Government for any excess costs for such similar supplies or services: *Provided*, That the Contractor shall continue the performance of this contract to the extent not terminated under the provisions of this clause.

> \* \* \* \* \*

(e) If, after notice of termination of this contract under the provisions of this clause, it is determined for any reason that the Contractor was not in default under the provisions of this clause, or that the default was excusable under the provisions of this clause, the rights and obligations of the parties shall, if the contract contains a clause providing for termination for convenience of the Government, be the same as if the notice of termination had been issued pursuant to such clause.

If after notice of termination of this contract under the provisions of this clause, it is determined, for any reason that the Contractor was not in default under the provisions of this clause, and if this contract does not contain a clause providing for termination for convenience of the Government, the contract shall be equitably adjusted to compensate for such termination and the contract modified accordingly; failure to agree to any such adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled "Disputes."

(f) The rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.

ascertain problems and necessary action. In each event, Astro-Space Laboratories explained the problems encountered and indicated that delivery could be accomplished within a few days. It appeared at this time that Astro-Space could still make delivery without experiencing undue delays.

\* \* \* \* \* \*

It is the conclusion of Marshall Space Flight Center personnel that with the proper planning, procedures, and equipment the parts can be heat treated and machined as specified on Drawing 30M14708, Revision A, using conventional processes and equipment. This is substantiated by the fact that the AEC-Union Carbide operated shop has recently advised this Center (October 25, 1968) that the spare part being furnished by them has presented no special machining or heat treat problems, and will be completed by the week of November 4, 1968.

Pursuant to the above, it is hereby determined that Astro-Space Laboratories is in default for failure to deliver in accordance with the terms of the contract, and such failure or default is not due to causes beyond the control and without fault or negligence of the contractor. Repurchase of the same fittings as those called for in the contract shall be made against the contractor's account as soon as practicable in order to avoid further delay to the ATM Program.

Thereafter, and specifically on October 30, 1968, the contracting officer notified plaintiff that contract NAS8–23774 was terminated for default, because of plaintiff's failure to perform within the time specified in the contract.

At the time of the termination, defendant had only some 45 days remaining before a fast approaching critical use date. In fact, the record shows that defendant needed 10 fittings, 8 being necessary for actual use and two being available as spares, to meet a December 15, 1968, use deadline. The significance of this is best appreciated by noting that plaintiff's own contract allowed

some 60 days for delivery of the first 16 fittings. Thus, it was not realistic to assume that the Space Center would have the 10 needed fittings produced within the 45 days that remained if they resorted to competitive bid procedures in placing a reprocurement contract.

In order to insure that the needed fittings were available, the chief of the Structural Section of the MSFC, under his emergency contracting powers, on October 31, 1968, modified the work order under which the Oak Ridge facilities of the AEC were to originally produce a single fitting to call for the production of 11 fittings. The fittings were to be produced in accordance with MSFC drawings 30M14708–1 and 2, which were the same as those in plaintiff's contract. The Board found that the action by the chief of the MSFC Structural Section was done with the approval of the contracting officer.

The record shows that the AEC did supply 11 fittings identical to those that plaintiff had contracted to supply at a total cost of $31,704.92.

In addition, the Space Center, by way of its contracting officer, on October 31, 1968, contacted the seven contractors who, in addition to plaintiff, had submitted bids on contract NAS8–23774 to determine if they had retained the original RFP. After ascertaining that additional RFP's would be needed, each of the original seven bidders were issued a second RFP and requested to submit alternate bids for the production of 38 and 48 fittings. The fittings covered by this second RFP were exactly the same as those which plaintiff was required to produce. The reason the contractors were requested to submit alternate bids on 38 and 48 fittings was because on the date the RFP's were issued, November 1, 1968, it had not been established if the AEC would be able or willing to produce the 10 fittings. The Space Center received six bids by the November 7, 1968, closing date of the RFP.

Cullman Avionics, Inc., was low bidder for both the 38 and 48 fittings, and, after a pre-award survey was conducted to

establish if Cullman was capable of performing, contract NAS8–24351 was awarded on December 2, 1968. The fixed price of the Cullman contract for 38 fittings, at a unit price of $1,278, was $48,564. Cullman submitted a unit price bid of $1,181 for the 48 fittings.

By letter of March 24, 1969, the contracting officer assessed plaintiff for the total cost of reprocuring the 48 fittings. The demand was for $40,666.60 and was arrived at by subtracting the fixed price of plaintiff's contract, $36,720, from the $48,564 for Cullman's contract and $^{10}\!/_{11}$ of the $31,704.92 charged by the AEC for 11 fittings.

### A. *Defendant's First Counterclaim for the Cullman Reprocurement*

Plaintiff argues that the Board was in error in its assessment of $11,844 as the excess reprocurement costs for the Cullman contract. Plaintiff contends that the contracting officer did not reasonably mitigate plaintiff's damages. Plaintiff bases this argument on the contention that the Space Center knew plaintiff had stopped work on the contract on September 11, 1968. Plaintiff thus contends that defendant should have acted immediately to mitigate plaintiff's damages. Plaintiff points out that defendant did not terminate the contract until October 30, 1968, some 49 days after the work stoppage. Moreover, the Cullman contract was not awarded until December 2, 1968, some 80 days after plaintiff's work stoppage. Had its contract been timely terminated, plaintiff argues, more time could have been allowed for bidding and for fabrication, probably inducing all seven firms solicited to bid, instead of six. Further, plaintiff argues that all 48 items could have been procured in a single transaction, thus reducing the unit cost. In short, plaintiff charges that the contracting officer's actions in terminating its contract and in pursuing reprocurement were untimely.

Plaintiff's contentions are fundamentally unsound. The Board found that the reprocurement was timely.

First, the default termination was timely. Although plaintiff correctly notes that it notified the Government of its work stoppage as of September 11, 1968, it fails to point out its own concurrent request for a termination of the contract for convenience, or alternatively, a modification of the contract to a cost basis.

As has been shown in the recitation of the events surrounding the termination, plaintiff continued to contemplate the possibility of completing the contract, albeit on different terms, long after September 11, 1968. Further, the contracting officer could not, under the terms of the contract, terminate for default until after he had received plaintiff's answer to his September 30, 1968, show cause letter. The Astro-Space answer was not received until October 14, 1968. The Cullman contract was executed within 33 days of the default. The Board obviously felt these times were reasonable, and the evidence, as outlined in considerable detail hereinabove, supports such a finding.

In reprocuring items on a defaulted contract, the contracting officer has very broad discretionary powers. See United States v. Warsaw Elevator Co., 213 F.2d 517, 518 (2d Cir. 1954). In the instant case, Article 11(b) of the contract, entitled "Default," states:

> In the event the Government terminates this contract in whole or in part * * * the Government may procure, *upon such terms and in such manner as the Contracting Officer may deem appropriate*, supplies * * * similar to those so terminated, and the Contractor shall be liable to the Government for any excess costs for such similar supplies * * *. (Emphasis added.)

Of course, a contracting officer will not be allowed to abuse his discretion. Indeed, a contracting officer must act reasonably, within the particular set of circumstances, in reprocuring. Whether a contracting officer has acted reasonably, as the circumstances of the particular reprocurement dictate, is a question of

fact. Accordingly, the findings of fact, concerning reprocurement, of an administrative board are binding on this court if supported by substantial evidence. H & H Mfg. Co., Inc. v. United States, 168 Ct.Cl. 873, 883–885 (1964). More precisely, a contracting officer is under a duty to:

(a) act within a reasonable time after default;

(b) obtain a reasonable price; and

(c) mitigate the default by contractor's damages.

This court has held on numerous occasions that reasonable time depends on the facts and circumstances that exist in a particular situation, but the test is usually whether the contractor was charged a higher price due to the passage of time. Moreover, a contractor who alleges that it has been prejudiced by a contracting officer's delay has the burden of proof and the contractor must not have contributed to the delay. *Cf.* United States v. Warsaw Elevator Co., *supra.*

Similar rules apply in evaluating the time taken by a contracting officer in terminating a contract for default and, as well, in reprocuring after default.

The evidence, as noted, clearly supports the Board's finding that the actions taken by the contracting officer in this case were timely. While the contractor alleges that more timely action by the contracting officer would have encouraged seven rather than six bids, ostensibly at a lower price, there is not a shred of evidence to support this allegation. Moreover, competitive reprocurement is not required after default. The original RFP satisfies the statutory requirement for competition. While competitive reprocurement is considered desirable, since if offers firm evidence that the price was reasonable, it is not necessary.

Indeed, this court has held that when the contracting officer reasonably believes that the desired items are in critical short supply, even where there are several potential producers, the contract-ing officer may negotiate with a single source, *e. g.,* the only proven reliable producer. Consolidated Airborne Systems, Inc. v. United States, 348 F.2d 941, 947, 172 Ct.Cl. 588, 598–599 (1965); H & H Mfg. Co., Inc. v. United States, *supra,* 168 Ct.Cl. at 884–885.

The contracting officer's procurement of less than 48 items is questioned by the plaintiff, since this resulted in a higher unit price. However, this court has recognized that critical shortages can justify procuring less than the number of items in the original contract from one reprocurement source, and that it is up to the plaintiff to prove that such action is unreasonable. These issues involve questions of fact which are to be decided by the Board, and if properly supported, are binding on this court. Consolidated Airborne Systems, Inc. v. United States, *supra,* 348 F.2d at 948–949, 172 Ct.Cl. at 601–602. Here the Board found that the critical use deadline justified reprocurement from two sources, or, put another way, that the fittings needed for the December 15, 1968, use date could be procured from the AEC. The evidence overwhelmingly supports the Board's determination and it must be considered final. Furthermore, plaintiff cannot be heard to complain that it was prejudiced by higher unit cost for the 38 units reprocured from Cullman when its default created the shortages.

Thus, the Board's assessment against plaintiff of $11,844, arrived at by subtracting plaintiff's contract price of $36,720 from the Cullman contract price of $48,564 for the excess costs of the reprocurement of 38 fittings was neither arbitrary nor capricious and is supported by substantial evidence and is correct as a matter of law.

B. *Defendant's Second Counterclaim for Damages for Breach of Contract*

In addition to assessing the excess costs involved in reprocuring the 38 fittings from Cullman Avionics, Inc., the contracting officer also assessed the costs incurred by the Space Center in

reprocuring 10 of 11 fittings from the AEC. More particularly, the contracting officer appears to have disallowed the cost of one of the 11 fittings, since the initial work order for one fitting was made before the termination of plaintiff's contract. However, the cost incurred by the AEC in filling the October 31, 1968, work order for 10 additional fittings was felt to be justified. Thus ¹⁰⁄₁₁, or $28,822.60, of the total cost to the AEC for producing the 11 fittings was also assessed against plaintiff.

On appeal to the Board, all of the reprocurement costs by defendant in reprocuring the 11 AEC fittings were disallowed. The Board concluded that the costs for the single fitting produced under the October 2, 1968, work order were not properly chargeable against plaintiff because its contract had not been terminated as of that date.

Moreover, the Board disallowed all of the costs incurred as a result of the October 31, 1968, work order with the AEC because the order had been placed by the chief of the Structural Section at the Space Center and not by the contracting officer. In the words of the Board:

> We find that the procurement of ten fittings from AEC was not the independent and personal decision of the Contracting Officer, Mr. Houston McCullough, and no part of the costs therefor are properly chargeable to Appellant as reprocurement costs under the default termination.

Defendant no longer bases its demand for the AEC costs in producing 10 fittings on section (b) of the default article in plaintiff's contract. Indeed, no appeal appears to be taken by the defendant with regard to the Board's conclusions on this point.

Instead, defendant's second counterclaim is brought under section (f) of the default article. That article reserves to the Government, in addition to its contractual remedies, all remedies provided by law. Accordingly, by way of its second counterclaim, defendant seeks damages for breach of contract.

Further, defendant contends that plaintiff's breach has already been established. Defendant specifically argues that the Board has, in a decision which has been previously upheld in this opinion, made findings that a termination of plaintiff's contract for default was proper.

■ Findings of fact of a Board are, of course, final and binding in litigation properly before this court even as to the issue of breach of contract, over which the Board has no jurisdiction. United States v. Utah Constr. & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L. Ed.2d 642 (1966). Thus, defendant argues that the only thing which remains is for this court to recognize the reality of the situation, and declare plaintiff's default to be a breach of contract.

Defendant's contentions are well taken. Similar questions have been before this court on earlier occasions. See Rumley v. United States, 285 F.2d 773, 152 Ct.Cl. 166 (1961); Alabama Shirt & Trouser Co. v. United States, 121 Ct.Cl. 313 (1952); and Marley v. United States, 423 F.2d 324, 191 Ct.Cl. 205 (1970). The following passage from *Marley* is especially appropriate in this case (423 F.2d at 335, 191 Ct.Cl. at 224–225):

> *The Issue of Breach.* In this suit the issue of plaintiff's breach has, as the government contends, already been determined. The Board has, in a decision upheld in Part I of this opinion, made findings of fact that plaintiff defaulted, without excuse, and that the contract was properly terminated for his default. These findings of fact, made in a proceeding over which the Board had jurisdiction, are entitled to final and binding weight in the instant litigation, though the issue here is breach of contract, a matter beyond the Board's jurisdiction. * * * (Citations omitted.) It remains only to add the almost inevitable conclusion of law—that an unexcused default is a breach. * * * (Citation omitted.) No relitigation or

trial is necessary on the issue of breach. Partial summary judgment may be had on that issue.

For similar reasons, no relitigation or trial on the issue of breach is necessary in this case. Defendant's motion for partial summary judgment on that issue is granted.

There is, however, no proper record on which to base an award of damages, if any, against plaintiff stemming from the AEC work orders. It is up to the Government to prove that it suffered damages as a result of plaintiff's breach of contract. Therefore, further proceedings will be necessary to establish defendant's damages, if any, under its second counterclaim. Those proceedings will be governed by Rule 131(c)(2) of this court.

 The only question which remains is defendant's request, in connection with its two counterclaims, for interest. As has often been pointed out, the awarding of interest is discretionary with the court. For reasons so ably expressed in Stoeckert v. United States, 391 F.2d 639, 648, 183 Ct.Cl. 152, 167 (1968), where this court stated:

> Finally, consideration must be given to the defendant's contention that, under its counterclaim, it is entitled to interest on the excess cost assessment allowed by the CEBCA. The defendant admits that the award of interest is discretionary and, in the exercise of discretion, the court declines to make such an award in this case. We take into account the plaintiff's apparent financial condition, the long time it has taken to bring this case to final judgment, the plaintiff's good faith though he acted erroneously, and the fact that contractors prevailing over the Government do not normally collect interest on their awards.

It is concluded that defendant is not entitled to interest on the excess cost assessment allowed by the NASA Board of Contract Appeals.

## CONCLUSIONS

1. Plaintiff's motion for summary judgment, seeking review of the decision of the National Aeronautics and Space Administration Board of Contract Appeals, is denied, the Government's motion for summary judgment granted, and plaintiff's petition will be dismissed, with such dismissal to be withheld until final disposition of defendant's counterclaims.

2. Defendant's cross-motion for summary judgment on its first counterclaim is granted, and judgment will be entered for defendant thereon in the sum of $11,844 upon final disposition of defendant's second counterclaim.

3. Defendant's cross-motion for summary judgment on its second counterclaim with respect to plaintiff's liability for breach of contract is granted, and the case is remanded to the trial commissioner for further proceedings to determine the amount of recovery, if any, pursuant to Rule 131(c)(2).